# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-DP-01550-SCT

*GARY CARL SIMMONS, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/2/1997 |
| TRIAL JUDGE: | HON. BILL JONES |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN HOLDRIDGE |
| | ROBERT MICHAEL CUNNINGHAM |
| | WILLIAM HARVEY BARTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | JUDY T. MARTIN |
| DISTRICT ATTORNEY: | DALE HARKEY |
| NATURE OF THE CASE: | CRIMINAL-DEATH PENALTY-DIRECT APPEAL |
| DISPOSITION: | AFFIRMED-12/13/2001 |
| MOTION FOR REHEARING FILED: | 12/26/2001; denied 2/7/2002 |
| MANDATE ISSUED: | 2/14/2002 |

**EN BANC.**

**SMITH , PRESIDING JUSTICE, FOR THE COURT:**

¶1. On October 11, 1996, Gary Carl Simmons, Jr. (Simmons), and Timothy John "Timmy" Milano (Milano) were indicted for the capital murder of Jeffery Wolfe, while engaged in the commission of a robbery. Simmons and Milano were also indicted for the kidnaping and rape of Charlene Brooke Leaser. Simmons was arraigned in the Circuit Court of Jackson County on January 9, 1997, and pled not guilty to the pending charges. One month later, the trial judge appointed two attorneys, W. Harvey Barton and R. Michael Cunningham, to represent Simmons, an indigent. Milano's trial was severed from Simmons. On February 21, 1997, the trial judge granted a change of venue motion to allow jury selection from the venire in Lauderdale County, but then held that the remainder of the trial would be conducted in Jackson County, sequestering the jury for the duration of the trial.

¶2. The trial began on August 25, 1997, and four days later, the jury returned a guilty verdict on all three counts of the indictment. For the kidnaping and rape, Simmons was sentenced to separate life sentences. A separate sentencing hearing was held on the capital murder conviction and the jury found unanimously that Simmons should suffer death. Immediately thereafter, the trial judge sentenced Simmons to die by lethal injection on the capital murder charge and to two consecutive life sentences for the kidnaping and rape convictions.

¶3. Simmons's motion for a new trial and amended motion for a new trial were both denied by Judge Jones. Simmons' automatic direct appeal is now before this Court raising twenty-seven alleged errors at trial for consideration by this Court.

¶4. Finding no error, we affirm the trial court, upholding Simmons's guilty verdict and sentence of death as well as the two consecutive sentences of life imprisonment.

**I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING THE DEFENDANT'S SELF-DEFENSE INSTRUCTION.**

**II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING THE DEFENDANT'S MANSLAUGHTER INSTRUCTION.**

**III. THE TRIAL COURT'S RULINGS VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE.**

**IV. THE TRIAL COURT ERRED BY GRANTING TWO OF THE PROSECUTION'S INSTRUCTIONS DURING THE GUILT-INNOCENCE PHASE OVER THE DEFENDANT'S OBJECTIONS.**

**V. THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR A DIRECTED VERDICT AS THE JURY'S FINDING THAT A ROBBERY WAS COMMITTED WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

**VI. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY OVERRULING THE DEFENDANT'S MOTION FOR A MISTRIAL CONCERNING CERTAIN TESTIMONY OFFERED BY DENNIS GUESS.**

**VII. THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.**

**VIII. THE TRIAL COURT ERRED BY PERMITTING THE PROSECUTION TO ADDUCE EVIDENCE CONCERNING AN ALLEGED BURGLARY OF THE VICTIM'S ROOM AT THE KING'S INN HOTEL.**

**IX. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING THE DEFENDANT'S MOTION TO EXCLUDE EVIDENCE OBTAINED AS A PART OF AN ILLEGAL SEARCH AND SEIZURE.**

**X. THE TRIAL COURT ERRED BY ALLOWING THE EXPERT WITNESS**

TESTIMONY OF DEBORAH HALLER INTO EVIDENCE OVER OBJECTION FROM DEFENSE COUNSEL.

XI. THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR A CONTINUANCE.

XII. THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION IN LIMINE TO EXCLUDE CERTAIN PHOTOGRAPHS FROM ADMISSION INTO EVIDENCE.

XIII. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN RULING ON VARIOUS MATTERS IN THE GUILT PHASE OF THE TRIAL.

XIV. THE TRIAL COURT ERRED IN EXCLUDING A VIDEOTAPE OF THE DEFENDANT MADE HOURS AFTER THE COMMISSION OF THE CRIMES IN WHICH THE DEFENDANT DISCUSSES THE CRIMES AND EXHIBITS REMORSE FOR HIS PART IN COMMITTING THEM.

XV. THE PROSECUTOR ENGAGED IN MISCONDUCT REQUIRING REVERSAL.

XVI. THE TRIAL COURT ERRED BY SUBMITTING TO THE JURY THE AGGRAVATING CIRCUMSTANCE THAT THE DEFENDANT KNOWINGLY CREATED A GREAT RISK TO MANY PERSONS.

XVII. THE TRIAL COURT COMMITTED NUMEROUS REVERSIBLE ERRORS IN ITS RULINGS DURING THE SENTENCING PHASE OF THE TRIAL.

XVIII.THE TRIAL COURT ERRED BY GRANTING MANY OF THE PROSECUTION'S INSTRUCTIONS DURING THE SENTENCING PHASE OF THE TRIAL.

XIX. THE TRIAL COURT ERRED BY REQUIRING THE DEFENSE TO EXERCISE SOME OF ITS PEREMPTORY CHALLENGES PRIOR TO THE PROSECUTION TENDERING TWELVE ACCEPTED JURORS.

XX. THE TRIAL COURT ERRED IN THE PROCEDURE IT USED IN SELECTING THE COUNTY FOR THE CHANGE OF VENUE.

XXI. THE TRIAL COURT COMMITTED NUMEROUS REVERSIBLE ERRORS DURING THE "DEATH/LIFE" QUALIFICATION COMPONENT OF VOIR DIRE.

XXII. THE TRIAL COURT ERRED BY ALLOWING THE PROSECUTION TO OBTAIN A PROMISE FROM PROSPECTIVE JURORS TO RETURN A SPECIFIC VERDICT UNDER A SPECIFIC SET OF CIRCUMSTANCES.

XXIII.THE TRIAL COURT ERRED BY LIMITING THE VENIRE IN LAUDERDALE COUNTY.

XXIV.THE TRIAL COURT ERRED BY ALLOWING THE SELECTED JURORS TO RETURN HOME AND PACK CLOTHING FOR THE WEEK BEFORE BEING

**SEQUESTERED.**

**XXV. THE DEFENDANT HAS BEEN DENIED HIS RIGHT TO A MEANINGFUL APPEAL.**

**XXVI. MISSISSIPPI'S CAPITAL PUNISHMENT SCHEME IS UNCONSTITUTIONAL AND THE IMPOSITION OF THE DEATH PENALTY IN THIS CASE IS DISPROPORTIONATE.**

**XXVII. THE ERRORS TAKEN TOGETHER IN THIS CASE WARRANT REVERSAL.**

¶5. Before proceeding to the facts, the State asserts that Simmons's assignments of error numbered IV, VIII, XVI, XVIII, XIX, XX, XXII, XXIII, XXIV, and XXV should be procedurally barred from consideration by this Court. The State argues that the issues were not presented to the trial court and are therefore not properly before this Court. The State alleges that the error, if any, is waived due to the procedural bar. It has been repeatedly held that the procedural bar rule is not diminished in a capital case. *Cole v. State,* 525 So.2d 365, 369 (Miss.1987); *Irving v. State*, 498 So.2d 305 (Miss.1986); *Johnson v. State,* 477 So.2d 196 (Miss.1985); *In re Hill,* 460 So.2d 792 (Miss.1984); *Hill v. State,* 432 So.2d 427 (Miss.1983); *Chase v. State*, 645 So.2d 829, 845 (Miss.1994); *Foster v. State,* 639 So.2d 1263, 1270 (Miss.1994).

¶6. Simmons, in his reply brief, points out that this Court has "repeatedly relaxed the procedural bar rule in capital cases," citing *Harrison v. State,* 635 So. 2d 894 (Miss. 1994). Simmons also quotes from *Pinkney v. State,* which said:

> We have in death penalty cases the prerogative of relaxing out contemporaneous objection and plain error rules when the interest of justice so requires. Because the death penalty is a different sort of punishment with more severe consequences than other sentences, this Court's scrutiny of such cases is correspondingly heightened. In capital cases, the procedural bar is sometimes relaxed because of the nature of the right asserted. Also, this Court has relaxed its procedural bar to consider serious, cumulative errors. Even in capital cases procedural bars appear to be applied, based on a number of factors, on a case by case basis.

*Pinkney v. State*, 538 So.2d 329, 338 (Miss. 1988) (citations omitted). While these allegations of error are procedurally barred, we will address the merits of the underlying claims in the order raised by Simmons knowing that any subsequent review will stand on the procedural bar alone. *Chase v. State,* 645 So.2d at 845; *Foster v. State,* 639 So.2d at 1270.

## FACTS

¶7. In the early morning hours of August 11, 1996, Jeffery Wolfe and Charlene Brooke Leaser drove from Houston, Texas, to Jackson County, Mississippi. They had only known each other a few weeks. Wolfe asked Leaser to accompany him on a trip to the Gulf Coast to "pick up some money" from some friends that were in his debt. Leaser later learned that the debt accrued some weeks earlier from a transaction involving drugs. While on the Gulf Coast, Wolfe also planned to buy new wheel rims and tires for his vehicle

and then return through New Orleans with Leaser for a short vacation. Wolfe left Houston with twelve hundred dollars in his wallet. Leaser had approximately two hundred dollars in her purse.

¶8. Upon their arrival on the Mississippi Gulf Coast, they checked into the King's Inn Hotel. Wolfe and Leaser fell asleep. Wolfe awoke early and left Leaser at the Hotel to meet Sonny Milano, Timothy Milano's brother, who worked at a local tire store. Apparently, they met a few weeks earlier while Wolfe was on the Coast conducting his illicit business deal. Later that afternoon, Wolfe and Sonny returned to the hotel room to pick up Leaser for dinner. Sonny Milano left to get his girlfriend and the four met in Wolfe and Leaser's room at the hotel. They all took Wolfe's white Honda Civic to Shoney's where they dined together.

¶9. Sonny Milano testified that during dinner, Wolfe asked if Sonny planned to go to Simmons' house that evening. Sonny Milano, over loud protests from his girlfriend, decided to go to Simmons' house, arriving there late that evening after dropping her off. When he arrived, Simmons and Sonny's brother, Milano, were the only two at the house. Simmons asked Sonny if he had seen Wolfe and Sonny told him that they ate dinner together. Simmons asked Sonny to get in touch with Wolfe. Sonny contacted Wolfe at his hotel room and told Wolfe that he was at Simmons's house. Wolfe was pleasantly surprised to hear that Sonny was there, since Sonny's girlfriend was opposed to his going. Wolfe told Sonny that he would be there in a minute.

¶10. Sonny conveyed this information to Simmons, who less than one minute later, approached Sonny as he talked to Milano and asked him to leave the house. Sonny testified that he did not find this unusual because "that's just Gary." Sonny left without explanation, with Wolfe on his way.

¶11. After dinner, as the couples parted ways, Wolfe and Leaser returned to their hotel where they relaxed before leaving to meet Wolfe's debtors. They drove out to Simmons's house but found no one home. After leaving the house to pick up cigarettes and a beverage, Wolfe and Leaser returned to the hotel. To pass the time, the two then went to Wal-Mart, and again tried to meet Simmons at his house. Still, no one was home. By this time it was nearly 10 in the evening, August 12, 1996. Again, they returned to the hotel. Near midnight, Wolfe received a phone call while Leaser stood outside smoking a cigarette. Wolfe hung up the phone, gathered Leaser, and left the hotel headed toward Simmons's house.

¶12. Upon arriving at the house, they found Simmons sitting on the front porch. The three began talking, and Simmons offered them some marijuana. Leaser and Simmons smoked a marijuana cigarette, but Wolfe refrained. Milano drove up as they finished the marijuana. Simmons was related to the Milanos by marriage; Simmons married their sister, Lori, but that marriage ended in divorce. Simmons offered his guests a beer, and all four adjourned to the kitchen and living room area. Simmons walked into the kitchen to get a beer while Leaser sat down at a table in the living room to roll another marijuana cigarette.

¶13. Leaser heard Wolfe and Milano chatting in the doorway separating the kitchen and living room. Wolfe mentioned the money he was owed. Apparently, Simmons and Milano owed Wolfe between twelve and twenty thousand dollars. They did not have the money, nor did they have the drugs. Simmons returned from the kitchen while Wolfe and Milano discussed this predicament. Leaser testified that she heard gunshots and saw Wolfe fall to the ground. Immediately thereafter, Simmons grabbed Leaser and ordered her not to look in the direction of Wolfe's body. Leaser noticed Milano standing directly behind Wolfe holding what was later identified as State's exhibit 29, a .22 caliber rifle.

¶14. Simmons took her to a back bedroom of the house and forced her to lie face down on the floor. He

placed himself on top of her and began questioning her, asking whether she or Wolfe were law enforcement officers, whether Wolfe had any drugs with him, and who knew they were in Mississippi. She became understandably hysterical and simply responded that she did not know anything, as she and Wolfe had only become acquainted a few weeks ago. After Simmons finished questioning Leaser, he tied her hands behind her back, bound them to her feet with some rope, and locked her in a metal box with dimensions similar to a large footlocker near his bedroom, telling her he was "on a time frame" that he could not "mess up."

¶15. Leaser managed to untie her hands and feet and began kicking the top of the box unsuccessfully trying to get out. Leaser continued kicking the top of the box until Simmons returned. He removed her from the box, stripped her nude, tied her up again and returned her to the box. Again, Leaser managed to free herself from the knotted ropes, but remained unable to get the top off of the metal box holding her. After some length of time had passed, Simmons returned to the box and took Leaser out. Simmons was undressed. He again forced her to lie face down on the floor of the bedroom. Leaser was in the middle of her menstrual cycle, so Simmons forced her to remove her tampon. He then raped her, telling her that her life depended on how well she performed sexually. Leaser testified that she thought he was holding a pistol to the back of her head during the assault.

¶16. Afterward, Simmons asked Milano if he would like to rape her as well; Milano declined. Simmons then took Leaser to the bathroom, allowed her to clean up with an athletic sock; and yet again, tied her up and locked her in the box.

¶17. While Leaser was secured in the box, Simmons and Milano went about their plan to dispose of Wolfe's body. Simmons, by trade, was a butcher in a meat market. Simmons's co-worker, Charles Jenkins, testified that during the preceding workweek, Simmons sharpened all of his knives and took them home from work for the weekend. Jenkins testified that this was rather unusual because everyone normally leaves their knives at work. Apparently, the only time that Jenkins could remember anyone taking their knives home was before leaving on an extended vacation or quitting the job. Simmons took those knives and began dismembering Wolfe in the bathtub. After gutting him and severing his head and limbs, Simmons, with Milano's help, began distributing Wolfe's remains into the bayou that ran behind Simmons's property using a boat Simmons borrowed from neighbor Donald Taylor[1] only hours before. Alligators were known to inhabit the area. The bayou had a running current that eventually, through tributaries, fed into the Gulf of Mexico.

¶18. Leaser, still locked in the box, again untied herself. Simmons returned to the box smoking marijuana and offered some to Leaser. She accepted. After sharing the marijuana cigarette, Simmons locked Leaser in the box with a blanket, where she fell asleep. She awoke to the sound of the telephone ringing. When no one answered it, Leaser reasoned that the house was empty. She mustered all of her energy and began banging on the top of the box. The lid popped off and Leaser managed to get out of the house. On her way out of the door, she grabbed a bag with some of her clothes and belongings in it. She then partially dressed herself. Leaser ran to a neighbor's house and convinced the neighbor to call the police. Upon their arrival, Leaser recounted the events of the previous twenty-four hours.

¶19. Many different law enforcement agencies were involved in investigating the scene of the crime. Leaser told police officers that Wolfe was inside, had been shot, and that she had been raped. Once the police arrived, they began to secure the area and investigate Leaser's claims. Moss Point police officers Lee Merrill and Richard Cushman entered the house with Leaser to determine if a crime had, in fact, been

committed and if so, whether other victims were still in the house. Once the police officers saw blood and other evidence of violent crimes, they left the house and secured a search warrant.

¶20. After obtaining a search warrant, the police called the Mississippi Crime Lab, and they entered the house to gather evidence. From inside the house, they collected portions of fingernails from a wastebasket, a used condom, and two used tampons, among other things. The local police department also recovered a Marlin model # 60 .22 caliber rifle, eight empty .22 caliber shell casings, and Wolfe and Leaser's personal items originally left in their hotel room.

¶21. Near the rear of the property, a small "jon boat" was spotted near the water. Officers Magee and Graff investigated and requested that Officer Cushman join them. Near the boat they found four five gallon white buckets, one green plastic barrel, a one gallon bottle of Clorox bleach, a brush, a knife, and a bushhook. The brush and bushhook appeared to be covered in blood. An aluminum boat paddle was covered in bloody finger prints. In the boat, the officers discovered a piece of flesh. The local coroner called Dr. Paul McGarry to help with the investigation. Outside the house, but still on or very near Simmons's property, Dr. McGarry found the rest of Wolfe's body. Dr. McGarry testified that he and a group of police officers floated approximately two hundred yards down the bayou over which they found various parts of the skin, muscle, chest, abdominal walls, penis and testicles, lungs, heart, intestines, liver, as well as fingers and toes from a young human white male.

¶22. Dr. McGarry testified that the body parts had been cut sharply and with precision into block like sections of tissue. Most of the bones had been separated. Of the flesh he found and examined, several pieces had bullet holes in them. One portion of the chest had five bullet holes in it while another portion revealed one bullet hole. Some of the internal organs, the heart and lungs specifically, also had bullet holes in them. The left lung had a bullet lodged in it. Dr. McGarry testified that these gunshot wounds were the cause of death.

¶23. A further search of the area revealed Wolfe's severed head, upper chest portion, and pelvic area sans reproductive organs. Over two days of searching, they found, on the first day, eighty-five pounds of human remains the largest of which was seventeen inches in diameter. The following day, they collected forty-one pounds of similar pieces, with the largest piece measuring nineteen inches. Some pieces found later were large enough to have identifiable tatoos. All of the flesh was identified as belonging to Wolfe.

¶24. Simmons left his house after dismembering and disposing of Wolfe. He drove to Mobile, Alabama, where he made a videotape for his ex-wife and children. Throughout the video recording, Simmons spoke to his family in the most general terms about what he had done, although he never specifically admitted committing any crimes. Simmons mailed the video cassette to his wife and drove back to the Coast. Upon arriving at his house, Simmons noticed that Leaser had escaped. He immediately left again and went to see his friend Dennis Guess.

¶25. Guess testified that while they were conversing, Simmons volunteered that he had just "whacked a drug dealer,...deboned him, cut him up in little pieces, and put him in the bayou." Simmons told Guess that he used a butcher knife and bolt cutters to accomplish the task. Simmons also told Guess that he had a girl in a box and planned to "train her" and "keep her around as a sex toy," but confessed that she had escaped. The conversation then turned to what realistic options Simmons had left. Simmons, after further discourse with Guess on this subject, decided against fleeing the jurisdiction or committing suicide. He eventually decided to turn himself in to the authorities.

<u>**STANDARD OF REVIEW**</u>

¶26. This Court will review an appeal from a capital murder conviction and death sentence with "heightened scrutiny" under which all bona fide doubts are resolved in favor of the accused. *Porter v. State,* 732 So. 2d 899, 902 (Miss. 1999). Further, this Court is cognizant of the fact that what may be harmless error in certain situations becomes reversible error where the penalty is death. *Id*.

<u>**LEGAL ANALYSIS**</u>

**I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING THE DEFENDANT'S SELF-DEFENSE INSTRUCTION.**

¶27. Simmons alleges that the trial court erred in denying his requested self-defense instruction. Simmons argues that the testimony of Dennis Guess established the factual basis necessary to provide the jury with a self-defense instruction. Simmons spoke with Guess soon after the killing. Guess testified that Simmons recounted the events of the evening to him and explained the alleged provocation behind the violent assault as follows:

> BY DENNIS GUESS: Okay, He [Simmons] said a drug dealer from Texas [Wolfe] and his girlfriend [Leaser] had come to his house night before last about midnight. Gary was supposed to have sold some drugs and collected some money for this guy. It didn't happen. Timmy [Milano] was supposed to have wasted the money, or the drugs, or what not. I don't know. But, anyway, the boy [Wolfe] broke bad on him and threatened him, to do something to him.

> \* \* \*

> BY ASSISTANT DISTRICT ATTORNEY SAUCIER: When you make the statement that the boy broke bad on him and he shot him, do you know who you are referring to in this statement when you said he just shot him?

> BY DENNIS GUESS: I made a reference to Wolfe being the one that broke bad. And either Gary or Timmy, unclear. One of them shot him.

¶28. Later, Leaser testified that Wolfe told her he always carried a .9 millimeter handgun, although she never saw it and one was never recovered. Leaser also testified that she never saw Wolfe brandish a weapon of any kind. Leaser further testified that Milano shot Wolfe while Simmons was with her in another room.

¶29. Simmons cites *Manual v. State,* 667 So. 2d 590 (Miss. 1995) as support for this assignment of error, where this Court held:

> In homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely, and the trial court's failure to do so is error requiring reversal of a judgment of conviction. *Hester,* 602 So. 2d at 872. Where the instructions are in improper form and are the only ones embodying a legally correct theory of the defendant's defense, it is the duty of the trial court to see that the instructions are placed in proper form for submission to the jury. *Id.* at 873.

*Manuel v. State,* 667 So. 2d at 593.

¶30. The State asserts that the record does not contain any evidence to support Simmons' self-defense instruction. Jury instructions should be given only when facts developed in the case being tried support them. *Walker v. State,* 740 So. 2d 873, 888 (Miss. 1999). All evidence points to Simmons and Timmy Milano having executed a planned assault. Jenkins testified that Simmons took his knives home for the weekend. Leaser's testimony regarding Wolfe being unarmed, combined with her testimony that all of the conversations involving Wolfe, Milano and Simmons were "friendly" and resembled "chit-chat" more than argument, points away from any self-defense theory. Leaser also testified that Simmons informed her that he was on a time frame, and ordered her not to mess it up. This clearly suggests some premeditation that would rule out self-defense as being a motivating factor. Finally, Taylor's testimony that Simmons borrowed the boat less than a day before the killing to "go fishing" indicates he had a plan to distribute the body long before Wolfe arrived. Further, "Mississippi adheres to the common law rule that an aggressor is precluded from pleading self-defense." *Layne v. State,* 542 So.2d 237, 244 (Miss. 1989). Here, there was ample testimony that placed Simmons and Milano as the aggressors, thus Simmons is precluded from pleading self-defense. The State argues that this testimony and case law render Simmons's argument baseless, and we agree.

## II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING DEFENDANT'S MANSLAUGHTER INSTRUCTION.

¶31. Simmons argues that, if not in self defense, Wolfe was killed in the "heat of passion" and he therefore deserved a manslaughter instruction. The term "heat of passion" has been defined by this Court as:

> a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Tait v. State,* 669 So. 2d 85, 89 (Miss. 1996) (quoting *Buchanan v. State,* 567 So. 2d 194, 197 (Miss. 1990)). Simmons again relies on the alleged confrontation between Wolfe and Milano as the basis for his actions. The burden to overcome the presumption of murder lies with the defendant. *Nicolaou v. State,* 534 So. 2d 168, 171 (Miss. 1988). Simply presenting testimony from a witness who states that the defendant told him the "boy broke bad" on him does not overcome this presumption. Although Dennis Guess also testified that there "was an argument over some money or drugs", he admitted he was unclear on that point. Leaser's eyewitness testimony refutes this allegation and crystallizes the nature of the encounter as conversational.

¶32. Additionally, where the killing occurred during the course of a robbery, the defendant is not entitled to a manslaughter instruction. *Burns v. State,* 729 So. 2d 203, 225 (Miss. 1998). Denial of a manslaughter instruction is proper where the record is clear that the decedent was shot with malice or deliberate design. *West v. State,* 725 So. 2d 872, 890 (Miss. 1998). More on point, the defendant in *Walker v. State* requested a self-defense instruction or provocation instruction because the defendant told a third party after the killing that the "dude [victim] made a move on him." 740 So. 2d at 888. The trial court denied this request, and this Court affirmed. It is clear that no reasonable hypothetical juror could find that this killing was without malice. *Berry v. State,* 674 So. 2d 1184, 1201 (Miss. 1996). There is no evidence in the

record that supports a manslaughter instruction under the aforementioned authority as the State adduced evidence throughout the trial relating to premeditation. Therefore, Simmons was not entitled to a manslaughter instruction. This assignment of error is meritless.

### III. THE TRIAL COURT'S RULINGS VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE.

¶33. Simmons argues that the trial court prevented him from fully presenting his defense. Essentially, Simmons believes that because he was unable to introduce testimony regarding Milano's alleged knowledge of Wolfe's supposed involvement in the death of a former roommate in Houston, Texas, he was denied his right to present a defense. The defense believes this information was essential to Simmons' defense because Wolfe allegedly played some part in his former roommate's death, the result of a drug deal gone bad. Simmons therefore wanted to introduce this evidence to show that Milano, the "trigger man", had a reason to fear for his life since he knew Wolfe had the potential to become violent when he realized that this drug deal was going to go bad as well.

¶34. Defense counsel tried to introduce testimony through Leaser regarding this alleged incident in Houston, Texas. The trial judge overruled these attempts to introduce this evidence saying "[s]he [Leaser] doesn't know anything about the Houston thing unless somebody told her that. And that's hearsay, and it's not admissible in this case. It's not even material in this case." Simmons argues that prior bad acts of the victim are admissible as a hearsay exception if the defendant knew of them because they exhibit a basis for Simmons to view Wolfe as the aggressor. In support of this proposition, Simmons cites ***Heidel v. State,*** 587 So. 2d 835 (Miss. 1991). In ***Heidel***, a man shot his wife after he said she attacked him with a butcher knife. Found guilty at trial, Heidel appealed alleging that the trial court erred in excluding his testimony regarding a previous incident only weeks before when his wife attacked him with a butcher knife. This Court held that

> Insofar as [the wife's] prior act may reflect a propensity for wielding her butcher knife, it was admissible on other grounds. True, we have a general rule that "a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion[.]" Rule 404(a), Miss.R.Ev., but this case falls within a long recognized exception. The exception allows the accused, claiming self-defense, to offer "[e]vidence of a pertinent trait of character of the victim of the crime...." Rule 404(a)(2), Miss.R.Ev. Heidel's justifiable homicide defense rendered Esther's propensity for violence a "pertinent trait of character of the victim," and it matters not how much of that defense had been put before the Court and jury at the time Heidel made his proffer.

***Heidel v. State,*** 587 So.2d 835, 845 (Miss. 1991). However, reading further, this Court also required the admissibility of this character evidence to rest upon whether Heidel presented "evidence of an overt act perpetrated against him by the victim." ***Heidel,*** 587 So.2d at 845. Simmons failed to clear this second hurdle. There is no testimony in evidence alleging that Wolfe made such an overt act. The only testimony resembling this comes from Dennis Guess who testified that Simmons told him that Wolfe "broke bad." This is contradicted by the testimony elicited from Leaser who said that Wolfe and Milano had not behaved in a confrontational manner, and in fact that they acted like friends. Beyond this, neither Milano nor Simmons had any personal knowledge of the incident in Houston, as in the ***Heidel*** case. It is clear that the trial judge was correct in excluding the testimony and references to it as hearsay.

### IV. THE TRIAL COURT ERRED BY GRANTING TWO OF THE PROSECUTION'S INSTRUCTIONS DURING THE GUILT-INNOCENCE PHASE OVER DEFENDANT'S OBJECTIONS.

¶35. Simmons alleges that the trial court erred in granting State's S-11[2] which he believes is an incorrect statement of the law. The State urges that this argument should be procedurally barred because defense counsel's objection to S-11 is different on appeal than the one offered at trial. At trial, it appears that defense counsel objected to S-11 on the grounds that it was an "aiding and abetting" instruction, rather than an incorrect statement of the law. The State cites *Doss v. State,* 709 So. 2d 369, 378 (Miss. 1996) for the proposition that an objection at trial on one specific ground constitutes a waiver on all other grounds.

¶36. Simmons believes that this instruction relieved the prosecution of its burden to prove all of the elements of capital murder, robbery, kidnaping and rape. Simmons cites generally *Hornburger v. State,* 650 So. 2d 510, 514 (Miss. 1995) and *Berry v. State,* 728 So. 2d 568 (Miss. 1999).

¶37. Both *Hornburger* and *Berry* are distinguishable because they involved instructions that told the jury that each person who commits any act that is an element of the crime is guilty as a principle. S-11 simply does not contain the operative language that could be construed as reading that a defendant found guilty of aiding and abetting with respect to one element of the crime is guilty as a principle. When determining whether error lies in the granting or refusal of various instructions, we must consider all the instructions given as a whole. *Coleman v. State,* 697 So. 2d 777, 782 (Miss. 1997). "When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman,* 697 So.2d at 782. The jury instructions listing the elements of capital murder (S-4a), robbery (S-3), kidnapping (S-7), and rape (S-8) all carefully lay out the elements of each crime. Additionally, Simmons is guilty as a principal under Miss. Code Ann. § 97-1-3 (2000).[3] Thus, we find no error in the giving of this instruction.

¶38. Simmons further claims that the trial court erred by granting jury instruction S-3b. The instruction is not contained in the record nor is it listed in Simmons' brief. This Court has held that the duty of the appellant is to present a sufficient record of the trial to prove that the alleged error actually occurred, and that the error was timely and properly preserved. *Walker v. State,* 671 So. 2d 581, 620 (Miss. 1995).

¶39. Simmons alleges that the instruction was improper because it allowed the jury to consider whether the underlying felony of robbery in the capital murder charge was based upon a robbery of either Wolfe or Leaser. Simmons also alleges that the State failed to prove what was taken during the robbery. The State based its case upon the notion that the murder was committed because Simmons and Milano owed Wolfe a debt they could not pay. Additionally, Leaser testified that when the police returned her belongings, she could not find $ 200 she placed in her purse for the trip. Additionally, Guess testified that Simmons said he was disappointed because Wolfe only had about one thousand dollars on him when he searched the body. This money was never recovered. The record easily supports the State's contention that the instruction had a sufficient evidentiary basis for both Wolfe and Leaser. In an effort to address the nature of the instruction, if not the exact language itself, the State cites *Gray v. State,* 728 So. 2d 36, 71 (Miss. 1998) (holding that where evidence is sufficient to support both phrases of a disjunctive statement, the use of the disjunctive term is of no consequence). This issue is meritless.

### V. THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR A DIRECTED VERDICT AS THE JURY'S FINDING THAT A ROBBERY WAS COMMITTED WAS AGAINST THE OVERWHELMING WEIGHT OF THE

**EVIDENCE.**

¶40. Simmons contends that the trial court erred in denying his motion for a directed verdict, and that the jury's guilty verdict on the underlying felony of robbery was against the overwhelming weight of the evidence. These arguments challenge both the weight and sufficiency of the evidence. This Court's standard in regard to challenges to the weight and sufficiency of the evidence is clearly defined in *McClain v. State,* 625 So. 2d 774 (Miss. 1993). This Court said:

> The three challenges by McClain (motion for directed verdict, request for peremptory instruction, and motion for JNOV) challenge the legal sufficiency of the evidence. Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court. This occurred when the Circuit Court overruled McClain's motion for JNOV. In appeals from an overruled motion for JNOV the sufficiency of the evidence as a matter of law is viewed and tested in a light most favorable to the State. The credible evidence consistent with McClain's guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. Matters regarding the weight and credibility of the evidence are to be resolved by the jury. We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Id.* at 778 (citations omitted).

¶41. Simmons argues that the prosecution failed to adduce evidence sufficient to convict him of robbery, as defined in Miss Code Ann. § 97-3-73 (2000).[(4)] Additionally, Simmons states that the prosecution failed to establish beyond a reasonable doubt that Wolfe's murder occurred during the commission of a robbery, violating the "one continuous transaction" language quoted in *West v. State,* 553 So. 2d 8, 13 (Miss. 1989). Lastly, Simmons argues that the State failed to prove that Simmons took any personal property belonging to Leaser with the intention of permanently depriving her of it.

¶42. The State asserts that Simmons unquestionably violated the provisions of Miss. Code Ann. § 97-3-73 and offers the testimony of Leaser and Dennis Guess as proof. Leaser testified that Simmons told her to remove all of her clothes and jewelry, and then he took them prior to raping her. Leaser never recovered the money missing from her purse. Leaser later recovered some of her belongings from a plastic bag in the kitchen as she dashed out of the door, making her escape. Simmons also confessed to Dennis Guess that he stole one $ 1,000 from Wolfe and was disappointed that Wolfe did not have more money on him at the time.

¶43. As for Simmons' argument that the language in *West* may be exculpatory in his case, a close reading of the language seems to belie this. This Court held that:

> Mississippi law accepts a "one continuous transaction" rationale in capital cases. In *Pickle v. State,* 345 So. 2d 623 (Miss.1977), we construed our capital murder statute and held that "the underlying crime begins where an indictable attempt is reached...." 345 So. 2d at 626. An indictment charging a killing occurring "while engaged in the commission of" one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony. E.g., *Neal v. State*, 451 So. 2d 743, 757-58 (Miss.1984). *The fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate*

*the capital charge.*

*West v. State,* 553 So. 2d at 13 (citations omitted) (emphasis added). Simmons's confession to Guess clearly reveals that the robbery occurred in connection with the killing. Also, the fact that he told Leaser before he raped her that he was "on a time frame" points out that he had a plan of some sort he tried to adhere to. Additionally, direct testimony from Simmons's neighbor, Donald Taylor, is illuminating on this subject. Taylor testified that just prior to the evening in question, Simmons asked to borrow his boat "to go fishing." Taylor obliged him, as he had done in the past, and Simmons took the boat to his land and tied it up behind his house. This was the boat used to disperse Wolfe's body over the bayou.

¶44. This line of reasoning is further bolstered by the testimony of Simmons's former co-worker at the butcher shop who saw him carry his knives home for the weekend and Rita Taylor, a neighbor and wife of Donald, who testified that she was awake at about 3:00 a.m. on the night in question and stepped outside to put some bills in her truck to mail the next day and saw, by illumination of the streetlight, Simmons and Timmy Milano, both of whom she was previously acquainted with, each carrying a white bucket toward the bayou. Later, the authorities found several white buckets by the boat and identified DNA matter on them. These testimonials serve as additional evidence of premeditation to kill and dismember Wolfe in an effort to dispose of the body.

¶45. Accepting as true all credible evidence consistent with Simmons guilt as true and giving the State the benefit of all favorable inferences, there is overwhelming evidence that with respect to each element of the offenses charged, reasonable and fair-minded jurors could find Simmons guilty.

### VI. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY OVERRULING THE DEFENDANT'S MOTION FOR A MISTRIAL CONCERNING CERTAIN TESTIMONY OFFERED BY DENNIS GUESS.

¶46. Simmons directs this Court's attention to an unsolicited statement made by Dennis Guess on the stand and asks for reversal based upon this statement's alleged prejudicial affect on the jury. The exchange in question went as follows:

> BY DEFENSE COUNSEL BARTON: Now, I ask you whether or not Gary [Simmons] showed any remorse to you in the fact that he had cut Jeffery Wolfe up?
>
> BY DENNIS GUESS: Extreme remorse. He made a comment. He said that while he was in prison they told him that it gets easier and easier. He said this was so bad he just knew that he would never be able to do it again.

Immediately following this exchange between defense counsel and Dennis Guess, defense counsel asked for a bench conference outside the presence of the jury which was granted. Simmons attorney addressed the trial judge and asked that he grant a mistrial because of the "highly prejudicial representation" made to the jury about Simmons serving prison time. The trial judge denied the motion, but offered to grant a limiting instruction, which defense counsel turned down.

¶47. "A determination of whether such an error [prejudicial testimony presented to a jury] is incurable, resulting in a mistrial, rests within the sound discretion of the trial court." *Snelson v. State,* 704 So. 2d 452, 456 (Miss. 1997) (citing *Logsdon v. State,* 183 Miss. 168, 170, 183 So. 503, 503 (1938)). The trial judge overruled the mistrial motion saying that he did not think that the objectionable words "in prison" were

really that prejudicial since there was no reference to when he was in prison or for what particular reason. Judge Jones reasoned that the public (and the jury) may well reason that Dennis Guess was referring to when Simmons turned himself in to the authorities and placed in a holding cell. Judge Jones pointed out that the public does not differentiate between the terms "jail" and "prison" in the way the legal system does.

¶48. Simmons cites *Snelson v. State,* 704 So. 2d 452, 456 (Miss. 1997) for the proposition that references at trial to past incarceration may constitute reversible error. In *Snelson*, the defendant blurted out that this was the third or fourth time he was on trial for murder. Clearly, the situation here is quite different. An off-handed reference by a witness that Simmons expressed remorse when he was "in prison" is far less damaging than the defendant commenting that he was on trial again for murder, as he had been several times before. Additionally, the State did not solicit this testimony; it came out when defense counsel questioned him.

¶49. In *Wilcher v. State,* 697 So. 2d 1087, 1101 (Miss. 1997), a reporter being questioned as a witness stated that he interviewed the defendant on "death row" at "Parchman Penitentiary." The defense objected and the trial judge offered them a limiting instruction, but they did not request that he give it. The trial judge therefore did not give the limiting instruction and this Court found no error on appeal. *Wilcher,* 697 So. 2d at 1101. Further, where an objection is sustained and no request is made that the jury be instructed to disregard the matter, there is no error. *Marks v. State,* 532 So. 2d 976, 981(Miss. 1988). This issue is without merit.

## VII. THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

¶50. W. Harvey Barton, Simmons's trial attorney and one of the lawyers who perfected this appeal, alleges that he labored under "a classic conflict of interest" at trial and thus deprived his client of effective assistance of counsel. Simmons argues that because Barton failed to question Dennis Guess before he got on the stand, he was ineffective. Also, Simmons submits that because Barton represented Guess and his father in the past, he was under a conflict of interest in this case. The record is unclear on precisely what matters Barton represented the Guess family.

¶51. The standard for reviewing claims of ineffective assistance of counsel was set forth in *Hansen v. State,* 649 So.2d 1256, 1259 (Miss.1994) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984) ). The inquiry under *Strickland* is twofold: (1) was defense counsel's performance deficient when measured by the objective standard of reasonable professional competence, and if so (2) was [the appellant] prejudiced by that failure to meet that standard? *Hansen v. State,* 649 So. 2d 1256, 1259 (Miss.1994). Defense counsel is presumed competent and the burden of proving otherwise rests on the appellant. *Hansen,* 649 So.2d at 1258. The defendant must prove both prongs of the *Strickland* test to succeed. *McQuarter v. State,* 574 So. 2d 685, 687 (Miss.1990). This Court's scrutiny of defense counsel's performance is highly deferential. *Hansen,* 649 So. 2d at 1259. With respect to the overall performance of the attorney, his choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections falls within his discretion in planning a trial strategy. *Cole v. State,* 666 So. 2d 767, 777 (Miss.1995).

¶52. Simmons argues that because Barton represented Guess, a witness for the prosecution, and/or his family in other legal matters, Barton operated under a prejudicial conflict of interest. The only evidence in the record concerning this occurred when Barton spoke to the Court during the mistrial motion:

BY DEFENSE COUNSEL BARTON: Okay. I purposely did not talk to Dennis Guess before he took the witness stand for the reason that, number one, I represent his father and have for a number of years; number two, I think I have formerly given counsel advice to Dennis Guess; and, number three, I was satisfied with what he was going to say in his statement and I was prepared to accept that on the witness stand.

¶53. Simmons argues that based on this colloquy that the trial judge knew or should have known that Barton had a conflict of interest. The United States Supreme Court stated that "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that an 'actual conflict of interest adversely affected his lawyer's performance.'" ***Strickland v. Washington,*** 466 U.S. at 692 (citing ***Cuyler v. Sullivan***, 446 U.S. 335, 350 (1980)). "[T]he possibility of conflict is insufficient to impugn a criminal conviction on appeal." ***Wheat v. United States,*** 486 U.S. 153, 160 (1988). There is no evidence in the record to suggest that defense counsel acted in some manner other than capable. In fact, the trial judge commented as much when he said during his ruling on the Amended Motion for a New Trial that:

> I don't know anybody whatsoever, any lawyer that has defended a case any more stronger [sic] than Mr. Barton and Mr. Cunningham. I don't think the charge in regard to ineffective assistance of counsel [raised during the Motion for a New Trial] is justified . . . I have been seventeen years on the bench. And I don't know anybody that has worked harder in regard to defending a case, even at their on [sic] risk in regard to things.

The trial judge properly addressed this argument. There is no error here.

### VIII. THE TRIAL COURT ERRED BY PERMITTING THE PROSECUTION TO ADDUCE EVIDENCE CONCERNING AN ALLEGED BURGLARY OF THE VICTIM'S ROOM AT THE KING'S INN HOTEL.

¶54. Simmons argues the prosecution adduced "a significant amount of highly prejudicial evidence" that tended to establish that he burglarized the King's Inn hotel room that Wolfe and Leaser occupied while in Mississippi. Simmons was not indicted for burglary.

¶55. The testimony that Simmons refers to, as best as can be gleaned from the record and briefs, is Leaser's testimony that as she escaped Simmons' house the morning after the rape and murder, she saw her suitcase in the house. She testified earlier that when she and Wolfe left the hotel, her suitcase was there. The State argues that this assignment of error is procedurally barred. The State points out that Simmons failed to object when these facts were elicited and points to ***Williams v. State***, 684 So. 2d 1179, 1203 (Miss. 1996) which holds that the contemporaneous objection rule is applicable in death penalty cases.

¶56. Although there was no contemporaneous objection at trial, Simmons relies on this Court's power to address "plain error" when a trial court's error impacts a fundamental right of a defendant. ***Sanders v. State,*** 678 So. 2d 663, 670 (Miss. 1996). In addressing the merits of the claim, the State offers that:

> Generally, evidence of a crime other than that charged in the indictment is not admissible evidence against the accused. However, where another crime or act is "so interrelated [to the charged crime] as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences," proof of the other crime or act is admissible. Proof of another crime or act is also admissible where necessary to identify the defendant, to prove motive, or to prove scienter.

*Duplantis v. State,* 644 So. 2d 1235, 1246 (Miss. 1994). Evidence of other bad acts is admissible in order to tell a complete story to avoid confusion among jurors. *Ballenger v. State,* 667 So. 2d 1242, 1256 (Miss. 1995).

¶57. The State therefore argues that the burglary at the hotel is so interrelated to the capital murder charge that it constitutes a single transaction. The State believes this is a viable argument and asserts that this was part of the master plan by Simmons and Milano to cover their tracks and dispose of any evidence of the victims presence in the State of Mississippi. Also, the State argues that this testimony explains how Leaser's belongings ended up at Simmons's house. We find that the testimony was harmless.

### IX. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING THE DEFENDANT'S MOTION TO EXCLUDE EVIDENCE OBTAINED AS A PART OF AN ILLEGAL SEARCH AND SEIZURE.

¶58. Simmons argues that the search of his house and property violated his rights under the Fourth, Eighth and Fourteenth Amendments of the United States Constitution, as well as the corresponding sections of the Mississippi Constitution. Simmons argues that the trial court should have excluded the evidence obtained during this search including the murder weapon, the condom with incriminating DNA evidence, various body parts of the victim and the tools he used to dispose of the victim's body.

¶59. The trial court held a hearing on a motion to suppress the evidence collected from the house and surrounding property. Simmons argues that the police illegally searched his house before obtaining a warrant. From the record, it appears that two separate searches were conducted. Capt. Guy Magee and Harvey Graff initially went inside the house to look for other potential victims and secure the scene. After this initial search, Officers Cushman and Merrill searched the house with Leaser. They also looked for bodies and checked all of the rooms "to make sure that there was no one else in the house" rather than just perform a cursory search. Finding no one, they left the house and "secured it." Officer Cushman then went to get a search warrant for the house. When asked why he went in the house after Officers Magee and Graff but before a search warrant was obtained, Officer Merrill said that there was an attic and other small spaces that needed to be checked to see if anyone was hiding in there. Additionally, police officers were in boats on the bayou collecting body parts and looking around the outside of the property by the time Officer Cushman returned with the search warrant.

¶60. The right to be free from unreasonable searches and seizures is guaranteed by the Fourth Amendment of the United States Constitution as well as Article 3, Section 23 of the Mississippi Constitution. Section 23 of the Mississippi Constitution provides greater protections to our citizens than those found within the United States Constitution. *Graves v. State,* 708 So. 2d 858, 861 (Miss. 1998). This Court, speaking about searches of a private home has said:

> In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their ... houses ... shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'

*Graves,* 708 So. 2d at 861 (citations omitted).

¶61. The United States Supreme Court has recognized that warrantless searches are allowed if they fall under specifically established and well-delineated exceptions. *Id.* at 861. This Court has set forth numerous exceptions to the requirement of obtaining a valid search warrant, including search incident to arrest, search of a vehicle, plain view, stop and frisk, hot pursuit and emergency search, and administrative searches. *Id.* at 862. It is black letter law that the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement. *Cupp v. Murphy*, 412 U.S. 291, 295 (1973).

¶62. Using the emergency search exception, Judge Jones ruled that since the officers were faced with "exigent circumstances," it was reasonable to search the house. The trial judge noted that the emergency circumstances included the recognition that two suspects were involved, that several cars were parked outside of the home indicating the possibility that any number of people may still be inside, and Leaser's uncertainty about Wolfe's condition.

¶63. As to the issue of curtilage, the judge again held that the searches did not violate the Constitution because exigent circumstances, like the "ebb and flow" of the tide in the bayou, existed. The officers testified that they feared the flesh would be eaten in the brackish water, or float down stream if they did not recover it immediately.

¶64. "In determining whether evidence should be suppressed, a trial court's findings of fact are not disturbed on appeal absent a finding that the 'trial judge applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence.'" *Taylor v. State,* 733 So. 2d 251, 255 (Miss. 1999) (citing *Crawford v. State,* 716 So. 2d 1028 (Miss.1998)). The "emergency" or "exigency" doctrine is accepted as a narrowly defined exception to the general requirement of a warrant for all searches and seizures. *Graves v. State,* 708 So. 2d 858, 862 (Miss. 1999). The basic elements of the emergency exception are: (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; (2) The search must not be primarily motivated by intent to arrest and seize the evidence; (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. *Smith v. State,* 419 So. 2d 563, 570 (Miss. 1982) (rev'd on other grounds). The reasonableness of those circumstances must be evaluated on a case by case basis. *Smith v. State,* 419 So. 2d at 570. "Whether a subsequent entry is detached from an initial exigency and warrantless entry or is a continuation of the lawful initial entry can be determined only in light of the facts and circumstances of each case." *Id.* at 573.

¶65. The State argues that the second entry was simply a continuation of the first. They argue that a complete sweep of the house wasn't made by the initial search; and thus, a second search was necessary. Clearly, Leaser's statement that a victim remained in the house satisfied the first prong of the *Smith* test. While in the house, the officers arrested no one and seized nothing, thus satisfying the second prong of the *Smith* test. Leaser's statements regarding the violent crimes provide ample probable cause based upon the "totality of the circumstances" to satisfy the third prong. We find no error in the trial court's determination.

### X. THE TRIAL COURT ERRED BY ALLOWING THE EXPERT WITNESS TESTIMONY OF DEBORAH HALLER INTO EVIDENCE OVER OBJECTION FROM DEFENSE COUNSEL.

¶66. Simmons argues that the Director of the State Crime Lab's DNA division, Deborah Haller, should not have been allowed to testify on DNA probability statistics at trial because she holds a Bachelor of Science degree in Biology rather than a Ph.D. Haller testified that she had logged some hours of graduate work, but not yet earned her graduate degree. She noted that she had attended several courses offered at the F.B.I. Academy and worked for over ten years in the fields of serology and DNA analysis. Haller was also the senior analyst of the Crime Lab's bio-science division.

¶67. The trial judge conducted a voir dire of Haller and found her to be competent. The determination of the admissibility of expert witness testimony rests within the sound discretion of the trial judge. *Crawford v. State,* 716 So. 2d 1028, 1045 (Miss. 1998). We find no abuse of discretion; thus, this issue is without merit.

¶68. Simmons's further arguments under this assignment of error are rather unusual and unsupported by legal precedent. Simmons finds fault with Haller only reporting statistics on DNA profiles of white men when testifying as to whether or not the DNA found at the scene matched Wolfe. Haller told the jury that the blood from the crime scene was consistent with Wolfe's DNA and there was only a 1 in 390,000 chance that another Caucasian was the DNA donor. As the State pointed out, Wolfe was white. Any other racial group's statistics would be irrelevant.

¶69. Similarly, Haller testified that the DNA match from the sperm cells in the used condom were consistent with Simmons's DNA and that the particular DNA profile in the condom occurred in 1 in 80,000 people in the Caucasian population. Simmons also argues that she made basic errors as to statistical calculations and the distinctions she drew while testifying on the stand. All of these "errors" and "misstatements" should have and could have been dealt with on cross-examination. The defense had ample opportunity to question her about these alleged discrepancies at trial and, in fact, took full advantage of that opportunity. The jury chose to believe Haller. The jury is charged with listening to and reviewing conflicting testimony and witness credibility, and deciding whom to believe. *Wetz v. State,* 503 So. 2d 803, 807 (Miss. 1987).

¶70. Further, Simmons asserts that Haller shouldn't have been allowed to testify as to the mixture of DNA found in the condom and the probabilities that it matched both Simmons and Leaser. This is the same argument presented above on a different factual basis. There is no error here.

## XI. THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR A CONTINUANCE.

¶71. Simmons asks this Court to reverse this case based upon Judge Jones' failure to grant two requests for a continuance during the trial. The first request involved Simmons' desire to have more time for a DNA expert to review the results of the State's DNA analysis. The State provided the defense with the DNA results on July 23, 1997. On August 8, 1997, the defense filed a motion to acquire funds for a DNA expert of their own. The motion was heard on August 15, 1997. The trial was set to begin on August 23, 1997. The trial court granted the defendant the necessary funds, but denied the continuance.

¶72. The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice. *Coleman v. State,* 697 So. 2d at 780 (citing *Atterberry v. State,* 667 So. 2d 622, 631 (Miss.1995)). Unless a manifest injustice occurs as a result of the denial, this Court will not reverse. *Walker v. State,* 671 So. 2d 581, 591 (Miss. 1995).

¶73. The State argues that the defense knew at least three months prior to the production of the State's DNA report that they were doing DNA testing and that Simmons should have begun the process of hiring a DNA expert earlier to challenge the State's methodology or final report instead of waiting until the report was finished. The trial judge asked the defense if they had anyone in mind, knew how much money they would need, or any of the other information required before the judge could release State funds. The defense had no such information. The trial judge hesitated "to continue this case for the reason that a lot of effort has gone into it by Lauderdale County."

¶74. The trial court did grant an overnight continuance to the defense to allow them to further prepare for the cross-examination of the State's DNA expert with their DNA expert, Dr. Ron Acton.[(5)]

¶75. The defense cites *Polk v. State,* 612 So. 2d 381 (Miss. 1992) as authority for this Court reversing on failure to properly allow time for expert testimony relating to DNA evidence. In the appendix to the opinion, to be used as guidelines for the bench and bar on DNA testing, this Court held that it is imperative that no defendant have such evidence admitted against him without benefit of an expert witness to evaluate the data on his behalf. *Polk,* 612 So. 2d at 394. The record reflects that Dr. Acton was retained by the defense and that he participated in the defense, but never conducted an independent review of the DNA matter. Dr. Acton did not testify at trial. The record reflects that Dr. Acton was able to review the prosecution's report with defense counsel before Haller testified.

¶76. The State cites *Lewis v. State,* 725 So. 2d 183, 187 (Miss. 1998), which involved the defense counsel receiving expert footprint analysis from the State twenty-six days prior to trial. In *Lewis*, the trial court denied Lewis's motion for a continuance in order to get someone to rebut the State's footprint analysis. This Court held that Lewis had a meaningful opportunity to make use of the State's report, but failed to do so; thus, there was no error. The State argues the same reasoning applies to Simmons who could have gotten a DNA expert months in advance to monitor the procedures and evidence at the Crime Lab as Haller was conducting her analysis. The defense had a duty to supplement the record with a proffer of what their expert would have shown. They failed to do so. Thus, there is no error here.

¶77. Simmons's second claim for reversal based upon the trial court failing to grant a continuance occurred when the trial judge failed to grant a continuance when Leaser changed her testimony regarding her rape. Initially, Leaser claimed that both Simmons and Milano raped her. She recanted her allegation against Milano on her way to the trial from Houston, Texas.

¶78. The trial judge overruled the motion saying that the information was not exculpatory for Simmons, adding that although Leaser now claimed Milano did not rape her, she still claimed that Simmons did. Judge Jones noted that Simmons could cross examine Leaser on the trustworthiness of her testimony. In *Hughes v. State,* this Court rejected similar arguments based upon *Brady v. Maryland,* 373 U.S. 83, 87 (1963) and U.R.C.C.C. 9.04. *Hughes v. State,* 735 So. 2d 238, 253 (Miss. 1999). Reversal on this point only applies to favorable evidence, such as evidence which is either exculpatory, or which tends to impeach the State's case. *Hughes,* 735 So. 2d at 253. Here, as in *Hughes*, it is not clear that the evidence Simmons complained of favored his case or harmed the State's case against him. This issue is without merit.

### XII. THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION IN LIMINE TO EXCLUDE CERTAIN PHOTOGRAPHS FROM ADMISSION INTO EVIDENCE.

¶79. Simmons next assignment of error addresses the admissibility of certain photographs of Wolfe's body parts that were entered into evidence by the State. Specifically, the defense argues that the trial judge erred in admitting one photo of Wolfe's severed head into evidence.

¶80. Photographs of the victim have evidentiary value when they aid in describing the circumstances of the killing, the location of the body, the cause of death, or clarify or supplement a witness's testimony. *Gray v. State,* 728 So. 2d at 57. Their admissibility rests within the sound discretion of the trial court and will not be overruled unless there was an abuse of discretion. *Gray,* 728 So. 2d at 57. The discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value. *Woodward v. State,* 726 So. 2d 524, 535 (Miss. 1997). The mere fact that the defense is willing to stipulate what the prosecution hopes to prove by admitting the photographs into evidence does not bar their admissibility. *Hughes v. State,* 735 So. 2d at 263.

¶81. The prosecution used the photograph of the severed head several times. Once, they showed it to Officer Merrill, who identified it as Jeffery Wolfe's head. The defense objected to this as gratuitous, and the State responded that it needed it to identify the flesh found in the bayou as human, specifically belonging to Jeffery Wolfe. The defense was willing to stipulate that it was the remains of Jeffery Wolfe in the bayou. The judge overruled defense counsel's objection and the photo was entered as State's exhibit No. 8.

¶82. Later, the State again used the photograph when questioning Wolfe's girlfriend, Leaser. When the prosecution showed her the photograph and asked her to identify it, she burst into tears. Defense objected and said again that they were willing to stipulate that it was Wolfe, but the trial court overruled them, and Leaser positively identified it as Wolfe's head. The State argues that Dr. McGarry, the forensic pathologist, used the picture to describe the wounds around Wolfe's head and neck to match the type of instrument used to inflict those injuries. While Dr. McGarry does testify about the neck wounds, opining that the bush hook found at the scene was used to behead Wolfe, the record does not reflect that the State referred to exhibit No. 8 during questioning. Since the discretion of the trial judge runs toward unlimited admissibility, it is impossible for this Court to say that the trial judge abused his discretion.

### XIII. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN RULING ON VARIOUS MATTERS IN THE GUILT PHASE OF THE TRIAL.

¶83. This assignment of error really consists of at least 13 sub-parts that serve as allegations of reversible error in and of themselves. Simmons argues that individually and cumulatively, the errors warrant reversal. He relies generally on *West v. State*, 519 So. 2d 418, 419-24 (Miss. 1988), which involved a trial judge who overstepped the bounds of his authority by questioning witnesses and offering trial strategy to the prosecution. This Court reversed *West* based upon the judge's obviously improper actions recognizing that since trial judges have a great deal of influence with juries, they should be exceedingly careful in their manner and commenting in front of a jury. *West,* 519 So. 2d at 423.

¶84. The first error Simmons posits is addressed under Issue III-defense counsel's inability to elicit testimony about Wolfe's alleged involvement in a drug deal and murder in Houston, Texas, weeks before his trip to the Mississippi Gulf Coast. Simmons argues that the trial judge should have granted his request for a recess to confer with his client when this testimony was refused by the trial court. The record reflects that the trial judge told defense counsel that he would allow him to confer with his client as soon as questioning ended for the witness on the stand. A defendant and his attorney do not have a right to consult indiscriminately without leave of the court as one must adhere to orderly courtroom decorum and

procedure. ***Pendergraft v. State,*** 191 So. 2d 830, 839 n.1 (Miss. 1966). We find no error here.

¶85. Next, Simmons argues that the State's sustained objection during the following exchange when defense counsel addressed the jury during voir dire was error:

> BY DEFENSE COUNSEL BARTON: Do each of you understand that as he sits here today Mr. Gary Carl Simmons is an innocent man? Is there anyone here who doesn't believe he is innocent?
>
> BY DISTRICT ATTORNEY HARKEY: Judge, I object to that. That's not a correct statement of the law. As he sits here he is not innocent; he is presumed to be innocent.
>
> BY DEFENSE COUNSEL BARTON: So I left out the word presumed. He is presumed to be innocent. He is cloaked with that innocence. My apologies, Judge, if that -
>
> * * *
>
> BY THE COURT: Objection sustained.

This argument is without merit.

¶86. Simmons also believes that the trial court erred by overruling his objection to "reserve the right to object regarding his [Mr. Bush's] ultimate conclusions and opinions." Both the prosecution and the defense accepted Mr. Bush as an expert in fingerprint identification. Simmons does not offer a coherent argument and fails to cite relevant authority. Defense counsel never objected during any of the direct examination and took full advantage of cross-examination of this witness.

¶87. Next, Simmons argues that the trial court erred by striking all of the questions and non-responsive answers given by Timmy Milano. The defense called Milano to the stand and asked a number of questions insinuating his guilt, to which, under advice of counsel, he refused to answer, invoking his Fifth Amendment privilege against self-incrimination. The State moved that this exchange be stricken from the record and Judge Jones granted that request. Simmons cites ***Hall v. State,*** 490 So. 2d 858, 859 (Miss. 1986), which holds that it is reversible error to refuse to permit the defendant to call a witness to the stand and question him in the presence of the jury even though it had been demonstrated that the witness would refuse to answer based upon his Fifth Amendment privilege against self-incrimination. This case is distinguishable because Simmons was allowed to call Milano to the stand. This issue is meritless.

¶88. Simmons next contention, that Deborah Haller should not have been allowed to testify about certain aspects of the DNA evidence found at the scene is precisely the same argument presented under Issue X.

¶89. Simmons further argues that the trial court should have allowed him to introduce evidence concerning the past criminal records of Wolfe and Milano. Instead, the trial court granted the prosecution's motion in limine covering the previous criminal matters. This is the entire sum of his argument on this issue. Simmons simply asserts that the trial judge was in error and refers the Court to ***Newsome v. State,*** 629 So. 2d 611 (Miss. 1993), which addresses the admissibility of character evidence very generally. The referenced case bears no relevance to the issue in question, and we find no error here.

¶90. Next, Simmons argues that many sustained hearsay objections made at trial by the prosecution were erroneous. He cites no authority and gives no reasoning, but simply says that the trial court erred by

sustaining them. Failure to cite relevant authority obviates the appellate court's obligation to review such issues. *Williams v. State,* 708 So. 2d 1358, 1362-63 (Miss.1998).

¶91. Citing M.R.E. 602 (no testimony from witness allowed with lack of personal knowledge), 701 (opinion testimony of a lay witness) and *Terry v. State,* 718 So. 2d 1115, 1122 (Miss. 1998), Simmons argues that he should have been allowed to question Donald Taylor about Simmons's motives for using the boat. It was denied as speculative. Simmons cites several other objections as well that were of the same caliber. The *Terry* case holds that wide latitude should be afforded both sides in introducing evidence that supports their theory of the case, be it a defense or a scenario of how the crime unfolded. *Terry,* 718 So. 2d at 1122.

¶92. The relevancy and admissibility of evidence are largely within the discretion of the trial court and this Court should only reverse where it is clear that discretion has been abused. *Burns v. State,* 729 So. 2d 203, 218 (Miss. 1998). It is also well settled that error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right is affected by the ruling. Miss. Rules of Evid. 103(a). Simmons failed to show what right, if any would be affected by any of those rulings.

### XIV. THE TRIAL COURT ERRED IN EXCLUDING A VIDEOTAPE OF THE DEFENDANT MADE HOURS AFTER THE COMMISSION OF THE CRIMES IN WHICH THE DEFENDANT DISCUSSES THE CRIMES AND EXHIBITS REMORSE FOR HIS PART IN COMMITTING THEM.

¶93. Simmons next argues that the trial court erred in excluding from the jury a videotape that Simmons made of himself shortly after the murder, decapitation, dismemberment of the body of Jeffery Wolfe and throwing the pieces into a bayou in hopes that alligators would devour the evidence of the gruesome crime. Simmons apparently sent the videotape to his ex-wife who in turn delivered it to his lawyer. We find that this video is both irrelevant, as well as inadmissible, hearsay. If allowed, it would only have bolstered Simmons' testimony had he elected to testify, or absolutely prohibited cross-examination if Simmons decided not to testify. Simmons did not testify.

¶94. Before trial Simmons took the opposite view from his current position regarding the videotape, arguing that it should not be disclosed to the State and that if required to produce it that the videotape could not be used as evidence against Simmons because it was private communication protected by attorney-client privilege. The trial court ruled the videotape had to be produced, but reserved ruling on the admissibility of the tape until trial. Simmons filed an interlocutory appeal with this Court and we denied the petition. At trial, the State moved to compel Simmons to produce the tape which the trial court granted. The State subsequently moved to exclude the videotape and the trial court stated that he would consider and rule on that issue if and when Simmons offered the videotape into evidence. Simmons' counsel apparently thought that the State would introduce the videotape because of Simmons supposed admissions thereon. The State did not offer the tape into evidence, but rather subsequently moved in limine to exclude it. The trial court granted the motion subject to whether Simmons could lay a proper predicate for introducing the video during his case-in-chief.

¶95. Simmons argues that the denial of the videotape as mitigation evidence prevented him from demonstrating to the jury remorse for the crime. If allowed, however, Simmons would be enabled to end-run the hearsay prohibition by use of a self-serving videotape which was inadmissible as a statement against interest or for mental, emotional, or physical conditions then existing, because, such exception is applicable

only where a defendant is unavailable. M.R.E. 804(b)(3); M.R.E. 803(3). Simmons was present during trial and elected not to testify, thus he cannot satisfy the exceptions. Under M.R.E. 402 the videotape is simply not relevant and thus not admissible. In *Clanton v. State*, the Court noted that:

> Clanton, pre-trial, vigorously opposed the statements being offered into evidence by the State, which the court overruled. The State, however, at trial made no effort to offer either into evidence. Clanton did not testify in his own behalf, and no witnesses were offered by the defense. Clanton did seek to introduce the two statements.

*Clanton*, 539 So. 2d 1024, 1028 (Miss. 1989). In *Clanton* this Court held:

> These statements were hearsay. Ordinarily, under pre-rules decisions, they would have been inadmissible even if Clanton had testified, as an attempt to bolster his testimony. . . The mere fact that the statements were in writing and would have been admissible had the State offered them, assuming as the circuit judge held, they had been freely and voluntarily given, does not mean that Clanton had the right to introduce them to bolster his defense. And, most especially is this true since Clanton did not testify himself. . .

*Id.* The issue here is strikingly similar to *Nicholson ex rel. Gollott v. State*, 672 So. 2d 744, 754 (Miss. 1996), where this Court noted that, "Gollott wished to have the tape of his confession played at trial, to show the extremely upset and remorseful demeanor he had, in an effort to show he did not intentionally kill Diane, and that it was an accident." *Id.* This Court held that, "Our caselaw states that the defendant is barred from introducing a statement made by the defendant immediately after the crime, if it is self-serving, and if the State refuses to use any of it." *See also*, *Tigner v. State*, 478 So. 2d 293, 296 (Miss. 1985); *Jones v. State*, 342 So. 2d 735, 736-37 (Miss. 1977). Additionally, in *Shorter v. State*, 257 So. 2d 236, 240 (Miss. 1972), this Court held that "[i]t is a general rule that declarations of a party in his own favor are not admissible in his behalf." Further, in *Wilson v. State*, this Court stated:

> A declaration made by a defendant in his own favor, unless part of the res gestae or of a confession offered by the prosecution, is not admissible for the defense. **A self-serving declaration is excluded because there is nothing to guarantee its trustworthiness. If such evidence is admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence.**

*Wilson*, 451 So. 2d 718, 721 (Miss. 1984) (emphasis added).

¶96. Here, the State did not introduce the videotape, and the defendant, though present, did not testify. The trial court correctly ruled that Simmons must comply with precedent and the rules of evidence, and lay a proper predicate for the video to be admissible. He did not, and accordingly it was not admissible.

¶97. Besides, contrary to the view that the jury was prohibited from hearing that Simmons was remorseful, in fact, Simmons presented the issue of his supposed remorse for the murder legitimately and properly through the testimony of his friend, and State witness, Dennis Guess. The video, however, was self-serving hearsay, irrelevant and properly disallowed by the trial court.

## XV. THE PROSECUTOR ENGAGED IN MISCONDUCT REQUIRING REVERSAL.

¶98. This assignment of error is another where Simmons argues at least fifteen different subpoints under a main heading of "prosecutorial misconduct." As the State notes in its brief, Simmons should be procedurally barred from making many of these arguments because he failed to make a contemporaneous objection at trial. *Evans v. State,* 725 So. 2d 613, 670 (Miss. 1997). This Court has held that the failure by defense counsel to contemporaneously object to a prosecutor's remarks at trial bars consideration of prosecutorial misconduct allegations on appeal. *Davis v. State,* 660 So. 2d 1228, 1255 (Miss. 1995). "In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remark, but must also take into account defense counsel's opening salvo." *Edwards v. State,* 737 So. 2d 275, 299 (quoting *Booker v. State,* 511 So.2d 1329, 1331 (Miss.1987)). The State also cites *Holland v. State,* 705 So. 2d 307, 345-49 (Miss. 1997), as authority that the prosecutor is entitled to make inferences from the record and that all statements must be read in the context of the way they were presented to the jury.

¶99. Simmons rests his argument upon several cases, including but not limited to *Cabello v. State,* 471 So. 2d 332, 346 (Miss. 1985) and *United States v. Young,* 470 U.S. 1, 8 n.6, 105 S.Ct. 1038, 1043 n.6, 84 L. Ed. 2d 1, 8 n. 6 (1985). However, these cases do not hold what Simmons argues they do. They each address prosecutorial misconduct, but do not support reversal based upon similar statements made by prosecutors in those instances. For example, *Hickson v. State,* 472 So. 2d 379, 384 (Miss. 1985) does say that the prosecution should not be permitted to deflect the attention of the jury from the issues before it, but the Court was referring to distractions akin to the prosecutions' presentation of the victim's "pickled hands" sealed in a jar to the jury when they had not been offered into evidence nor received as an exhibit. The situation in *Hickson* is very different than the one we are faced with today; comments made by the prosecution about defense counsel's trial strategy.

¶100. The first allegation Simmons raises concerns the prosecutor's admonishment to Barton to "quit lying to the jury" during defense counsel's closing arguments. The exchange went as follows:

> BY DEFENSE COUNSEL BARTON: I want y'all to look at what the definition of what robbery is. But I want to give you a definition. It's out of the dictionary.

> BY DISTRICT ATTORNEY HARKEY: That's improper. He can't stand up and read a dictionary. It's a definition according to the law, not Webster.

> BY DEFENSE COUNSEL BARTON: Judge, I'm not reading the definition of robbery. If I can continue with my argument, I will clear it up.

> BY DISTRICT ATTORNEY HARKEY: Well, then quit lying to the jury.

> BY THE COURT: Well, you said you were going to read the definition of robbery from Webster's dictionary.

> BY DEFENSE COUNSEL BARTON: No, sir. The definition of robbery is a jury instruction. And if I misquoted that, I'm sorry.

It seems as though District Attorney Harkey was responding to defense counsel Barton's attempt to introduce improper lay definitions of legal terms, and was done in a effort to rebut an argument proffered by the defense. *Evans v. State,* 725 So. 2d 613, 673 (Miss. 1997). Simmons offers no analysis of the statement and its prejudicial effect. No contemporaneous objection was made, so the State invokes the

procedural bar.

¶101. The second set of questionable statements surrounds Simmons's elusive expert, Dr. Ron Acton. Defense counsel Barton was cross-examining the prosecution's DNA expert, Deborah Haller, and asked the following question that elicited the objectionable comment by Assistant District Attorney Saucier:

> BY DEFENSE COUNSEL BARTON: Knowing that you were preparing to testify as a DNA analyst in the Gary Simmons trial and knowing that [Assistant District Attorney] Ben Saucier had called you and Dr. Acton had called you, what, please ma'am, prevented you from making a copy of your file and giving it to Ben Saucier, myself, or Dr. Acton before yesterday morning?

> BY ASSISTANT DISTRICT ATTORNEY SAUCIER: Counsel knows the answer to that because I wasn't getting in between two experts, one of whom I don't have any respect for. And I specifically told this lawyer [Barton] that I wasn't dealing with Dr. Acton. I ran him out of this courtroom one time about five years ago and I didn't want to have nothing else to do with him. He knows the answer. I told him to have his pseudo-expert get in touch with my lady.

The two sides exchanged barbs during respective closing arguments, calling each other's experts "pseudo" experts, while the State noted that Dr. Acton "won't even come into the courtroom."

¶102. As the State points out, no contemporaneous objection was made and raises the procedural bar. Simmons offers no further argument other than it amounts to general "prosecutorial misconduct" to make these statements.

¶103. Next, Simmons argues that District Attorney Harkey "launched a highly prejudicial attack" on Barton in his closing arguments by saying:

> BY DISTRICT ATTORNEY HARKEY: . . . or hear from lawyers who ask questions with no answers. From lawyers who speculate, who tell you [sic] speculate, who tell you a story as if he is producing a movie - producing a movie or something. I have never heard an argument like I just heard in court.

> BY DEFENSE COUNSEL BARTON: Excuse me. If I'm not allowed to attack them, then I would offer the same objection and ask that he not be allowed to attack me, because that would be a personal attack.

> BY THE COURT: I think he is attacking your argument. You cannot attack personalties in regard to counsel.

> \* \* \*

> BY DISTRICT ATTORNEY HARKEY: Hello. Where are we? I thought I was in one trial. The defense thought they were in another, and they heard all this other stuff.

This is what the defense finds objectionable. It seems clear that the prosecution is attacking the argument and defense theory rather than Barton personally.

¶104. Simmons further argues that the prosecution prejudicially attacked him by asking Barton, "What rule is that? Use the rule book counselor. Find that for me." when responding to Barton's assertion that certain

testimony should be allowed under a hearsay exception. The State raises its procedural bar again, as Barton failed to make a contemporaneous objection alleging prosecutorial misconduct through personal attacks.

¶105. Simmons also argues that it was prosecutorial misconduct for the prosecutor to ask Lori Simmons whether or not Barton also served as her ex-husband's divorce attorney and to later refer to his client as a "sociopath". Again, no argument is raised in support of this issue by Simmons; and again, the State raises the procedural bar.

¶106. Simmons is also upset that the prosecution, during closing arguments, told the jury that Simmons could not get a fair trial in front of twelve people in Jackson County. This comment, made in an effort to express agreement with defense counsel, was in direct response to a similar comment made by defense counsel during their closing argument:

> BY DEFENSE COUNSEL CUNNINGHAM: . . .and that's the reason you are here. Because we could not get twelve people to sit in that jury who had not already predisposed his guilt.
>
> * * *
>
> BY ASSISTANT DISTRICT ATTORNEY SAUCIER: And counsel opposite is right. We could not get twelve people in this county because of the absolute horrible nature and how it impacted our county.

Further, the State raises the procedural bar due to lack of a contemporaneous objection.

¶107. Simmons also argues that the prosecutor committed reversible conduct during the voir dire based upon the following exchange with a potential juror. The question was whether anyone had a family member that was a victim of a violent crime:

> BY VENIRE MEMBER NUMBER 106: 106, Barbara Hannah. I did not put it on the form because it happened years ago in 1979. It was my ex-husband's niece who was murdered during a rape.
>
> BY DISTRICT ATTORNEY HARKEY: Is there anything about that experience that would influence you today? I mean, 1979, I'm not sure Mr. Simmons was in the State of Mississippi at that time. Would there be anything about that that would influence you one way or the other?

The defense failed to raise a contemporaneous objection, thus the State raises the procedural bar. During jury selection, she was excused for cause. Again, no argument in support is presented by the defense.

¶108. Simmons also alleges that the prosecutor commented on his decision not to testify. He cites *Griffin v. State,* 557 So. 2d 542 (Miss. 1990), which said:

> No person ... shall be compelled in any criminal case to be a witness against himself, ... U.S. Const. Am. 5. See also, Miss.Code Ann. section 13-1-9 (1972); *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). This constitutional right has been construed by this Court to have been violated, not only when a direct statement is made by the prosecution as to the defendant's not testifying, but also by a comment which could reasonably be construed by a jury as a comment on the defendant's failure to testify.

*Griffin,* 557 So. 2d at 552. On this basis, Simmons argues that the following exchange amounts to reversible error by the prosecution for making said improper reference. This colloquy occurred while defense counsel was questioning Leaser:

> BY DEFENSE COUNSEL BARTON: But did you know whether Gary Simmons knew that you were going to be there?
>
> BY BROOKE LEASER: I don't know. You would have to ask him.
>
> BY DEFENSE COUNSEL BARTON: For all Gary Simmons knew -
>
> BY DISTRICT ATTORNEY HARKEY: Excuse me, Judge. He gets an answer, the only answer this witness can give. Now he wants to argue with the witness.

Simmons does not explain how this amounts to a comment by the prosecution on his failure to testify. Since this comment came from the witness he was questioning and no contemporaneous objection was made, the State again invokes the procedural bar.

¶109. Next, Simmons argues that the State improperly referred to matters outside the record. Counsel is allowed considerable latitude in the argument of cases. *Ivy v. State,* 589 So. 2d 1263, 1266 (Miss. 1991) (citing *Craft v. State,* 271 So. 2d 735, 737 (Miss.1973)). The boundaries are well established, limiting counsel to the facts introduced in evidence, deductions and conclusions he may reasonably draw therefrom, and the application of the law to the facts. *Ivy,* 589 So. 2d at 1266 (citing *Davis v. State,* 530 So. 2d 694, 701-02 (Miss.1988)). Simmons points to a reference the prosecution made that Leaser would have been killed had she not escaped as improper. Simmons believes that nothing in the record points to him expressing a desire, directly or indirectly, to kill Leaser.

¶110. The State argues that all of the evidence regarding his intentions to cover up the crime and his statement to Dennis Guess that he regretted that Leaser got away serve as an evidentiary basis to draw the inference that he planned to kill the only eyewitness. Leaser's testimony regarding the specifics of the rape seem to indicate that Simmons contemplated killing her. She testified that she thought Simmons put a gun against the back of her head and told her that her life depended upon how well she preformed sexually.

¶111. Simmons also argues that the prosecution went outside the boundaries of the evidence when they noted that Simmons planned the killing rather than Milano and that Simmons was no longer allowed to see his step-daughter. The State invokes the procedural bar on both of these issues. With regard to the statements about Simmons's step-daughter, his ex-wife testified that she divorced him because of "allegations" made against him by his step-daughter. The record does not reflect the prosecution or defense making any reference to sexual impropriety. Obviously, the prosecution is allowed to comment on a statement made by a witness.

¶112. As for the comment concerning the premeditated nature of the murder, Simmons' actions of taking his butchering tools home from work for the weekend, an unusual move, and committing the act in his home provides an adequate evidentiary basis for alleging that he planned the event. It is a question for the jury to decide.

¶113. The defense also argues that Wolfe's pistol was found in his car. The pistol was never produced at trial and the prosecution consistently argued that it was not found. Simmons doesn't attempt to state how

this is prosecutorial misconduct. The State never wavered from its proposition that if, in fact, there was a gun, it was never recovered. Leaser testified that Wolfe told her he had one, but she also testified that she never saw it. Again, the State invokes the procedural bar.

¶114. The defense also feels the prosecution was out of line when it said during the Motion for a New Trial, that they possessed no evidence of Milano having a previous drug conviction. The trial court granted a motion in limine suppressing all references to the previous criminal records of Wolfe and Milano. Apparently, Milano had a conviction for the sale of narcotics in the State of Connecticut. Defense Counsel Barton found out about this and wanted to use it at trial. Barton argues that because there was an actual conviction that was on record as a proffer, the prosecutor misstated the evidence in the record. This Court will not hold the prosecution in error for observing a court order.

¶115. Simmons also accuses the State of misstating the law regarding the correct presumption of innocence, the standard of guilt beyond a reasonable doubt, and the *Enmund* factors. The State raises its procedural bar against all of these allegations of error. As to the comment regarding Simmons presumption of innocence, Simmons objects to the following comment made by the prosecutor during voir dire:

> Presumption of innocence goes along until the case is proved [sic] to the standard that's necessary beyond a reasonable doubt. Do you understand that? And that's the law. And the burden is always on the State of Mississippi to prove its case. But the Judge, by telling you that Mr. Simmons as he sits here is presumed to be innocent is not making a judgment about Mr. Simmons. He is telling you what the law is. Understand?

In reference to the "reasonable doubt" standard, the following is what Simmons objects to:

> Beyond a reasonable doubt. That's the law. We agree with that. Right? Will you hold us to that standard? Will you hold us to the standard of beyond a reasonable doubt and not hold the State of Mississippi to beyond all possible conceivable imaginary doubt? To my way of thinking, that's a different standard, a lot harder, lot higher. I'm splitting hairs with you.

Simmons's arguments about the sentencing instruction hinge on the prosecution's comments during closing arguments of the sentencing hearing reviewing the sentencing instruction with the jury. It went as follows:

> The first is that you have to find one of four things really. If you don't find any of them, go home; it's over. That's the first bus stop. That Gary Carl Simmons actually killed Jeffery Wolfe. I will tell you right now that's not out theory, never has been. He didn't pull a trigger. He didn't actually kill him. The second one is that the Defendant, Gary Carl Simmons attempted to kill, Not our proof, not our theory, you haven't found that. Nobody has argued that to you. So the first two are out that door. The next two I think you can find. I think yo u have found them already. He has been found guilty of capital murder. Killing during the commission of a robbery. Number 3, the defendant intended the killing of Jeffery Wolfe to take place. That sounds reasonable. You have heard that before. That's what y'all did by your first verdict. That's exactly what you did. You found that he was involved in the killing, and it was for robbery and expungement of debt. You found that. The forth one is that he contemplated lethal force would be used.

The *Enmund* factors to be considered are whether the jury makes a written finding of one or more of the following: (a) the defendant actually killed; (b) the defendant attempted to kill; (c) the defendant intended

that a killing take place; (d) the defendant contemplated that lethal force would be employed. ***Enmund v. Florida,*** 458 U.S. 782, 797-801, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982); ***Humphrey v. State,*** 759 So. 2d 368, 382 (Miss. 2000)(citing Miss. Code Ann. § 99-19-101(7) (1994). These are precisely the factors that the prosecution covered in that statement to the jury. Not one of the myriad allegations listed above individually or cumulatively require reversal predicated upon prosecutorial misconduct in this case.

### XVI. THE TRIAL COURT ERRED BY SUBMITTING TO THE JURY THE AGGRAVATING CIRCUMSTANCE THAT THE DEFENDANT KNOWINGLY CREATED A GREAT RISK TO MANY PERSONS.

¶116. Simmons argues that the trial judge erred when he submitted to the jury the aggravating circumstance contained in Miss. Code Ann. § 99-19-101(5)(c)[(6)] that the defendant knowingly created a great risk to many persons in killing Jeffery Wolfe. Simmons believes the trial judge was in error because there was insufficient evidence proffered by the State to support either of the submitted theories alleged to have created this "great risk."

¶117. Specifically, Simmons believes that the State failed to show who, other than Wolfe and possibly Leaser, would have been at "great risk" when Timmy Milano discharged the weapon that night. Simmons argues that "two" people do not constitute "many" people as the statute contemplates. He offers ***Jackson v. State,*** 684 So. 2d 1213 (Miss. 1996) as an example. In ***Jackson***, this Court affirmed the use of the aggravator because four children were stabbed to death and one adult and two other children received life threatening wounds. ***Jackson,*** 684 So. 2d at 1235. Use of this aggravating circumstance is not limited to those crimes where very large numbers of individuals are at risk or those where the safety of others than the intended few was jeopardized. ***Id.*** at 1235. The State argues that the procedural bar should apply. However, Miss. Code Ann. § 99-19-105(3)(b)[(7)] states that this Court must consider the sufficiency of the evidence to support the aggravating circumstances.

¶118. Beyond this Simmons argues that, if he caused risk of harm to a great many people, it was not done so knowingly. He cites ***Porter v. State,*** 732 So. 2d 899, 905 (Miss. 1999) (rev'd on other grounds). Porter was hired to shoot and kill a man. He did so and then fled the scene. Simmons cites ***Porter*** for the proposition that, although reversed on other grounds, the Court instructed the lower court on remand not to give this aggravating factor again because there was little chance that someone ot her than the intended victim would have been harmed.

¶119. The State argues that Milano's repeated firing of the rifle in a residential neighborhood suffices as knowingly creating a risk of death to many people. As best as one can glean from the record, Milano and Wolfe were the only two people in the room when the killing occurred. While it is undeniably dangerous to fire a weapon inside of an occupied house, we are unsure that if upon doing so, you have knowingly created a great risk of death to many people. This Court would have to conclude that Wolfe, Leaser, and Simmons together constitute "many" people for purposes of the statutory language. We decline the opportunity to do so here.

¶120. Additionally, the State argues that placing body parts, fluids and other vestiges of human remains in community waters, as Simmons did, also creates a risk of harm to many people; we agree. Simmons contaminated the recreational waters of the residential neighborhood with Wolfe's remains, much of which was not recovered by police. These actions were intended to attract alligators and other similar creatures in an effort to use what nature had to offer to dispose of the evidence. Adjoining landowners and other water

enthusiasts were subjected to this inherent danger as a direct result of Simmons' actions. In addition, all of those residents who used that water as it carried the solid and liquid remains of Wolfe through tributaries into the Gulf of Mexico were subjected to this toxic mixture as well.

¶121. Simmons also claims that the use of this aggravator is unconstitutionally vague. This Court has held that Mississippi's capital sentencing scheme, as a whole, is constitutional. *Puckett v. State,* 737 So. 2d 322, 363 (Miss. 1999). Thus, this claim is meritless.

¶122. We find that the evidence regarding Simmons' disposal of Wolfe's remains into the bayou constituted a knowingly creating a great risk to many people. There is no reversible error here.

**XVII. THE TRIAL COURT COMMITTED NUMEROUS REVERSIBLE ERRORS IN ITS RULINGS DURING THE SENTENCING PHASE OF THE TRIAL.**

¶123. Simmons argues that the trial court committed numerous errors at the sentencing phase of the trial. Simmons believes that the trial court disallowed mitigation evidence that would have helped him avoid receiving the death penalty. This Court has held that the jury must have as much information as possible when it makes its sentencing decision. *Mackbee v. State,* 575 So. 2d 16, 39 (Miss. 1990). Mississippi allows evidence of a mitigating circumstance of an unlimited nature. *Mackbee,* 575 So. 2d at 39.

¶124. Simmons argues that the limitations placed on the following exchanges between his ex-wife and counsel constitute reversible error on the trial court's part:

BY DEFENSE COUNSEL BARTON: Lori, do you know what might have caused the events leading up to what happened on August the 13, 1996?

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: To that I'm going to have to object. That's just too much speculation. We have tried to be as reserved on objections as we possible can.

BY THE COURT: Objection sustained.

\* \* \*

BY DEFENSE COUNSEL BARTON: When you heard that Gary had been charged with this crime, did you believe that this was the same Gary that you had been married to all those years?

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: That's been asked and answered, Your Honor, earlier on when he asked her virtually the same question.

BY THE COURT: Objection sustained.

\* \* \*

BY DEFENSE COUNSEL BARTON: Does he [Simmons] love [his daughters] Heather and Felicia?

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: Objection, Your Honor. Calls for speculation.

BY THE COURT: Objection sustained.

* * *

BY DEFENSE COUNSEL BARTON: Lori, would you like to see that type of continuing relationship, as bad as it may be, exist between you, Felicia, Heather and Gary?

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: Objection, Your Honor. That's impact on family members. We object to it.

BY THE COURT: Objection sustained.

* * *

BY DEFENSE COUNSEL BARTON: But you still would like the father of your children-

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: Objection, Your Honor. That's an impact question.

BY THE COURT: Objection sustained.

Simmons argues that the answers to these statements were admissible under M.R.E. 401, 403, 602, 608, 701 and the Eighth Amendment to the U.S. Constitution.

¶125. Those responsible for sentencing the defendant should not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Wilcher v. State,* 697 So. 2d 1087, 1103 (Miss. 1997) (citing *Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982)). The rule expressed in *Eddings* "does not limit the trial court's power to exclude from the sentencing phase as irrelevant, evidence not bearing on the defendant's character or prior record, or the circumstances of the offense." *Wilcher,* 697 So.2d at 1103 (citing *Cole v. State,* 525 So.2d 365, 371 (Miss.1987)). "[I]t is clear that the evidence must be relevant to one or more of those factors." *Id.* at 1103.

¶126. Lori Simmons was not prohibited from fully testifying to crucial evidence during the sentencing phase. She had already been asked about and answered some of these exact questions, and subsequently discussed much of the very subject matter of the initially prohibited answers. She was allowed to testify that Gary was "the hardest working man" she knew. Regarding the crime of August 13, 1996, Lori had already testified that, "I didn't believe it. I thought someone was calling me and playing a prank at work actually." Subsequently, Lori did testify that she loved Simmons and that Simmons loved and was a good father to his children, in fact that his "greatest joy in life" was his daughters . Although the trial judge may have initially erred in sustaining the State's objections to several questions posed to Lori, in fact, subsequently, she was allowed to respond and fully explore the issues posed by the previous denied questions. This Court will only reverse where the trial court has abused its discretion. *Burns v. State*, 729 So. 2d 203, 218 (Miss. 1998) (quoting *Hentz v. State*, 542 So. 2d 914, 917 (Miss. 1989). Nor was there any prejudice or injury to any substantial right since Lori ultimately testified regarding issues upon which she was initially precluded from testifying. M.R.E. 103(a). Error here was cured, thus harmless.

¶127. Additionally, Simmons argues that the trial court should have granted his motion for a cooling off period after the verdict was rendered before having the jury consider sentencing. In a similar situation we have stated:

The jury brought the guilty verdict in at 12:46 p.m., and the judge allowed a 15 minute recess before beginning the sentencing phase of the trial. The judge, in denying the motion, noted that it was the middle of the day, the jury had already eaten lunch, and he did not see any reason for a cooling off period. Mississippi's statutory scheme concerning the guilt and sentencing phases of a capital murder trial provides only that "[t]he proceeding shall be conducted by the trial judge before the trial jury as soon as practicable." Miss.Code Ann. § 99-19-101(1) (1994). Ordinarily, trial judges have broad discretion in determining how long trials last on any given day. In utilizing this discretion, trial judges should keep in mind the mental and physical toll that litigation takes on the lawyers involved and the defendant's right to effective assistance of counsel.

*McGilberry v. State,* 741 So. 2d 894, 919 (Miss. 1999) (citations omitted). The situation in *McGilberry* is almost identical to this case. The defense noted that it was Labor Day weekend and one juror had a paid vacation he was waiting to embark upon. The defense wanted to wait until the following Tuesday to conduct sentencing, but the trial judge said that after questioning the juror during voir dire, he didn't think that the vacation meant that much to him. The motion was made by 1:00 p.m. on a Friday afternoon and defense counsel offered no other reason for the requested six-hour cooling off period or, in the alternative, the entire weekend, besides letting the jurors "collect their thoughts" to avoid any "inflamed, impassioned, or prejudiced" thoughts lingering from the verdict deliberations. The State objected and the trial judge saw no evidence of inflamed passions or prejudice among the jurors. The trial judge, in his discretion, determined that it was proper to go forward. The defense has done nothing to show that this was improper or an abuse of discretion.

### XVIII. THE TRIAL COURT ERRED BY GRANTING MANY OF THE PROSECUTION'S INSTRUCTIONS DURING THE SENTENCING PHASE OF THE TRIAL.

¶128. The State argues that this allegation of error should be procedurally barred. The record reflects that the sentencing instructions were given by agreement and without objection. Simmons now asserts that the trial court committed reversible error in ruling on the instructions for the sentencing phase [8]. Simmons specifically alleges that the trial court submitted the "non-existent statutory aggravator" that the capital offense was committed for pecuniary gain during the commission of a robbery. He alleges that Miss. Code Ann. § 99-19-103 contains no such language and pursuant to *Hunter v. State,* 684 So. 2d 625 (Miss. 1996) this Court should reverse because it is fundamental error for the trial court to fail to properly instruct the jury with regard to the law. The State points this Court to language in *Turner v. State,* which quotes *Jenkins v. State,* 607 So. 2d 1171, 1182 (Miss.1992), rejecting this argument because the use of robbery and pecuniary gain aggravators were, in essence, just one. *Turner v. State,* 732 So. 2d 937, 955 (Miss. 1999).

¶129. Similarly, Simmons argues that the trial court erred in instructing the jurors that they were to "consider the detailed circumstances of the offense" citing *Leatherwood v. State,* 539 So. 2d 1378, 1383 (Miss 1989) as support for the proposition that a sentencing jury is limited to the enumerated aggravating circumstances and the mitigating circumstances offered by the defendant. Again, the State points to *Turner*, which held that the language "you may objectively consider the detailed circumstances of the offense for which the defendant was convicted" in the sentencing instruction is not error, but is recognized by this Court as proper. *Turner,* 732 So. 2d at 953.

¶130. Simmons points out error on the trial court's part that resulted from giving the jurors a "catch-all" mitigator, alleging that the jurors "could and would" have interpreted the instructions to read that they had discretion in deciding what was and was not a mitigating circumstance. The State refers this Court to a case involving identical arguments where we held that the language at issue did not authorize the jury to ignore non-statutory elements of mitigation, but rather instructed them that they might consider additional mitigating evidence. *Evans v. State,* 725 So.2d 613, 694 (Miss. 1998). It is therefore in conformity with Miss. Code Ann. § 99-19-101(1), which states that any relevant mitigating evidence introduced on behalf of the defendant may be considered by the jury. *Evans,* 725 So. 2d at 694. This Court has approved instructions containing this language and note that catch-all language regarding mitigating factors should be employed in every case. *Id.* at 694.

¶131. Simmons makes this same argument with regard to a jury instruction that he believes the jurors could and would have read as saying they could only consider a mitigating circumstance if they agreed unanimously. Again, this argument has been rejected by this Court. See *Williams v. State,* 684 So. 2d 1179, 1201(Miss. 1996) (holding that instruction that used the word"unanimous" in regard to aggravating circumstances, but not in regard to mitigating circumstances, is not error).

¶132. Simmons posits the argument that the jurors could and would have read the instructions as requiring that once one aggravating circumstance was found to exist, then the burden shifted to the defense to demonstrate that the death penalty should not be imposed. The language in *Williams* prevents this interpretation. Every mandatory element of proof is assigned to the prosecution. Neither the burden of production nor the burden of proof ever shifts to the defendant. *Williams,* 684 So. 2d at 1202.

¶133. In the alternative, Simmons argues that the instructions failed to require the prosecution to prove beyond a reasonable doubt that the aggravating circumstances were sufficient to impose the death penalty, that the aggravating circumstances outweighed the mitigating circumstances, and that the defendant should suffer death. The State argues that they were not required to prove that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt as that would be contrary to established case law. *Edwards v. State,* 737 So. 2d 275, 314 (Miss. 1999)(holding that the majority rule of this Court is that the jurors are required to find the existence of each aggravating circumstance beyond a reasonable doubt, but the jury is not required to find that the aggravating circumstances beyond a reasonable doubt outweigh the mitigating circumstances following the statute.).

¶134. Simmons also claims that he is entitled to have an instruction that the jury must find beyond a reasonable doubt that the death penalty is the appropriate penalty. This Court addressed this argument in *Wiliams* and said "[t]he Mississippi statutory scheme does not require this finding." *Williams,* 684 So. 2d 1202. None of the arguments asserted by Simmons under this issue, singly or cumulatively, require reversal.

### XIX. THE TRIAL COURT ERRED BY REQUIRING THE DEFENSE TO EXERCISE SOME OF ITS PEREMPTORY CHALLENGES PRIOR TO THE PROSECUTION TENDERING TWELVE ACCEPTED JURORS.

¶135. Simmons argues that the trial court erred by requiring "the defendant to exercise his seventh, eighth, and ninth peremptory challenges on jurors who had never been tendered to the prosecution for acceptance or peremptory challenge." After a careful review of the record, no evidentiary support for this argument can be found. The only segment of the record that closely resembles this accusation is reproduced below in the following exchange:

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: We should have used six challenges and now tender twelve.

BY DEFENSE COUNSEL BARTON: That's what I have got.

BY THE COURT: That's what I have got.

BY DEFENSE COUNSEL BARTON: We would strike number two. We will tender number five, strike number eleven. That's defense second strike. Strike number fourteen, . . . exercise D-8 strike on number forty-four, D-9 strike on number forty-five, tender number forty-seven. That's twelve jurors through forty seven.

The State exercised six peremptory challenges and tendered twelve potential jurors. The defense then exercised six peremptory challenges and accepted six. Defense counsel then proceeded to strike three jurors , accept six jurors, and tender the panel of twelve to the prosecution. Immediately thereafter, the State used four more strikes. At no point did the defense interpose an objection, thus the State raises it's procedural bar.

¶136. Simmons relies on Miss. Code Ann. § 99-17-3[(9)] to support his argument. This Court has mandated that the failure to abide by the statute is reversible error. *Peters v. State,* 314 So. 2d 724 (Miss.1975); *Gammons v. State,* 85 Miss. 103, 37 So. 609 (1905); *State v. Mitchel,* 70 Miss. 398, 12 So. 710 (1893).

¶137. Peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated. *Fleming v. State,* 732 So. 2d 172, 181 (Miss. 1999)(citing *Ross v. Oklahoma,* 487 U.S. 81, 88 (1988)). The State also cites Miss. Code Ann. § 13-5-87 (1972) which states that "[a]ll the provisions of law in relation to the listing, drawing, summoning and impaneling juries are directory merely, and a jury listed, drawn, summoned or impaneled, though in an informal or irregular manner, shall be deemed a legal jury after it shall have been impaneled and sworn, and it shall have the power to perform all the duties devolving on the jury."

¶138. Simmons still had a peremptory challenge to use after all sides agreed on the jury. No objection was made, and a panel of twelve was submitted to the defendant at the beginning of the exchange. This argument is without merit.

### XX. THE TRIAL COURT ERRED IN THE PROCEDURE IT USED IN SELECTING THE COUNTY FOR THE CHANGE OF VENUE.

¶139. The defense argues that the trial court erred in when it allowed the prosecution to "determine which county venue was changed to upon proper application by the defendant for a change of venue." Simmons argues that the trial judge based his decision "solely on the prosecutor's directive." The record belies this assertion.

¶140. Mississippi law recognizes that the granting of a change in venue is a matter largely within the discretion of the trial court. *Evans v. State,* 725 So. 2d 613, 646 (Miss. 1997). The decision to change venue, although left to the sound discretion of the trial judge, is not one involving unfettered discretion.

*Evans,* 725 So. 2d at 646.

¶141. The trial court arrived at the decision to change venue in the following manner:

> BY THE COURT: Does either side have any suggestions in regard to the site to change this venue to?
>
> BY DEFENSE COUNSEL CUNNINGHAM: We are still in the preliminary stages of getting some research on that matter, Your Honor, and trying to reach a decision. Offhand, we would hope for a county in northern Mississippi if at all possible.
>
> BY ASSISTANT DISTRICT ATTORNEY SAUCIER: Your Honor, I look at Interstate 20 as a good area because it is outside the normal publishing area . . . And I would submit to the Court that probably Lauderdale or Rankin County would be more suitable as a trial site just for the purposes of having a municipal area.
>
> BY DEFENSE COUNSEL CUNNINGHAM: Specifically, Your Honor, we would oppose Rankin County. We would request Lafayette, possibly Granada [sic] County, Montgomery County in North Mississippi.
>
> BY THE COURT: How about Lauderdale County?
>
> BY DEFENSE COUNSEL CUNNINGHAM: I'm not prepared to comment on that at this point, Your Honor.
>
> BY THE COURT: I don't know what facilities Granada [sic] County has. Are you familiar with theirs?
>
> BY ASSISTANT DISTRICT ATTORNEY SAUCIER: I am. I'm not satisfied with Granada [sic]. And the distance, also, Your Honor, is adding another hundred miles plus above Jackson. I think once you reach I-20 I can't imagine that there would be any publicity of this at all that would possibly taint any jury. The makeup of Lauderdale County I do know is very similar to the makeup of Jackson County as far as populations and races of population. . . . ample courthouse space, ample facilities.
>
> BY THE COURT: The court will grant a change of venue, and we will change the venue to Lauderdale County.
>
> BY DEFENSE COUNSEL CUNNINGHAM: To Lauderdale?
>
> BY THE COURT: Lauderdale.
>
> BY DEFENSE COUNSEL CUNNINGHAM: All right, sir.

Thus, the record reflects that the trial judge considered the racial makeup of the counties, the courthouse space, and other factors before making his decision. Simply because the trial judge selected one of the counties offered by the State does not qualify the decision as reversible error due to the trial judge's wide latitude of discretion in rendering those types of decisions. Further, Simmons raised no objection. This issue is procedurally barred, and we further find it to be meritless.

### XXI. THE TRIAL COURT COMMITTED NUMEROUS REVERSIBLE ERRORS

**DURING THE "DEATH/LIFE" QUALIFICATION COMPONENT OF VOIR DIRE.**

¶142. Simmons argues that the trial court erred by granting the State's cause for challenge of potential juror Paula Evans. Additionally, Simmons believes that the trial court erred by denying defense counsel's challenges for cause regarding jurors Price, Hart, Null, Schanrock, Haynes, Robertson, and Johnson.

¶143. With regard to Paula Evans, the thrust of her testimony is that, when asked by the prosecution if she could set aside her personal beliefs against the death penalty, she continually responded by saying that she "would try" her best to do so or that she thought she could do it. This Court has held that a prospective juror who indicates that he or she would "try" to follow the court's instruction is not enough. *Billiot v. State,* 454 So. 2d 445, 457 (Miss. 1984).

¶144. Simmons's complaint against the other seven jurors is questionable at best. The record reflects that Simmons did not use all of his peremptory challenges. The record further reflects that none of the contested jurors served on the actual jury panel. The State believes that Simmons argument should fall under the weight of the following authority:

> The law afforded Hansen twelve peremptory challenges. Miss.Code Ann. § 99-17-3 (1972). He exercised but seven--three being used on jurors Woodward, Adams and Conduit. Our settled rule requires that, before an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he utilized all of his peremptory challenges. See, e.g., *Berry v. State,* 575 So. 2d 1, 9 (Miss.1990); *Chisolm v. State,* 529 So. 2d 635, 639 (Miss.1988); *Johnson v. State,* 512 So. 2d 1246, 1255 (Miss.1987); *Billiot v. State,* 454 So. 2d, 445, 457 (Miss.1984). The reason for the rule is that the appellant has the power to cure substantially any error so long as he has remaining unused peremptory challenges. We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges and, suffering an adverse verdict at trial, secure reversal on appeal on grounds that the Circuit Court did not do what appellant wholly had power to do.

*Hansen v. State,* 592 So. 2d 114, 129 (Miss. 1991). Further, each juror testified that they could put aside their personal views about the death penalty and follow the law in regard to Simmons' case. It appears that, by this admission, they rehabilitated themselves. This language of "putting aside" personal beliefs was approved in the following passage of *Leatherwood v. State*:

> The two veniremen, Robert Nations and Mary Garrett, indicated that they had strong views in favor of the death penalty. After the court overruled appellant's challenge to the jurors, appellant used two of his peremptory challenges to strike them. We have carefully considered the questions propounded to and responses of Nations and Garrett and are of the opinion that the trial court's ruling was in full compliance with *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). When questioned by counsel both jurors said that they could put aside their personal feelings, follow the law and instructions of the court and return a verdict based solely upon the law and the evidence and not vote for the death penalty unless the evidence warranted it.

*Leatherwood v. State,* 435 So. 2d 645, 654 (Miss. 1983). The trial court cannot be said to have erred by following this language.

¶145. Simmons also contends that the trial judge erred by conducting an individualized voir dire of the

jurors who were in favor of the death penalty. This Court has said that voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." ***Ballenger v. State,*** 667 So. 2d 1242, 1250 (Miss. 1996). This Court has directed the trial court to take a substantial role in conducting ***Witherspoon*** voir dire of potential jurors in capital cases. ***Ballenger,*** 667 So. 2d at 1250. There is no error here.

### XXII. THE TRIAL COURT ERRED BY ALLOWING THE PROSECUTION TO OBTAIN A PROMISE FROM PROSPECTIVE JURORS TO RETURN A SPECIFIC VERDICT UNDER A SPECIFIC SET OF CIRCUMSTANCES.

¶146. Simmons argues that the trial court erred by allowing the prosecution to obtain pledges from jurors to convict him of rape and sentence him to death. Simmons alleges that the prosecution was inappropriately allowed to pose questions to prospective jurors concerning how they would act if presented with a certain set of hypothetical circumstances, which he believes resembled those of the case at hand. The allegations are based upon a series of questions concerning the jurors' willingness to impose the death penalty for various crimes and convict for rape without evidence of the utmost resistance. The first line of questioning went as follows:

BY DISTRICT ATTORNEY HARKEY: . . . [O]f the ones who responded that you can make that consideration that the law requires you to make, before imposing a penalty of death would you require a multiple killing, a killing of more than one person?

BY THE JURORS: No.

BY DISTRICT ATTORNEY HARKEY: Anybody fell that way?

BY THE JURORS: No.

BY DISTRICT ATTORNEY HARKEY: Anybody fell that before I can impose the death penalty I need to know that we have a fellow with a lot of crimes, he has been in a lot of trouble?

BY THE JURORS: No.

BY DISTRICT ATTORNEY HARKEY: What you are telling me basically is that you can consider the death penalty for one homicide.

BY THE JURORS: Yes.

BY DISTRICT ATTORNEY HARKEY: Can you do that?

BY THE JURORS: Yes.

BY DISTRICT ATTORNEY HARKEY: For one killing. Can you do it?

BY THE JURORS: Nod (in the affirmative).

BY DISTRICT ATTORNEY HARKEY: Anybody feel that regardless of what other aggravating circumstances are presented, if he didn't kill more than one person, or if he wasn't in trouble with the law I don't think I can impose a death penalty? See how it gets a little bit more information? You

follow me? See what I'm saying? You get more information. I want to know right now if it would affect you one way or the other. Would it, anybody?

BY SOME JURORS: No.

Simmons also disapproves of the following question:

BY DISTRICT ATTORNEY HARKEY: With respect to the rape case, would the evidence for you to find somebody guilty of committing rape, would you require the State of Mississippi to prove or require that a victim come in here and say that she resisted until she was beaten to a bloody pulp and seriously injured before you could find someone guilty? We are talking about forcible rape here. I believe force is an element that we are going to have to prove. But would you require a victim resist until she is unconscious, fight and struggle dealing against overwhelming odds?

¶147. The defense asserts that these questions, along with questions posed to a particular prospective juror, violate Mississippi's rule against eliciting promises from jurors that they will return a specific verdict under certain circumstances. Miss. U.R.C.C.C. 3.05. Simmons relies heavily upon *Holland v. State*, in which counsel for the defense was restricted from asking whether prospective jurors would automatically rule out alcohol as a mitigating factor. *Holland v. State*, 705 So.2d 307, 338-39 (Miss. 1997). "It is reversible error to ask a juror during voir dire to commit to returning a particular verdict." *Stringer v. State*, 500 So. 2d 928, 938 (Miss. 1986).

¶148. The State points out that Simmons failed to contemporaneously object to any of the questions it now lists as error. In *Edwards v. State*, this Court held that the failure to object during voir dire barred the issue from being raised on appeal. *Edwards v. State*, 737 So. 2d 275, 308 (Miss. 1999).

¶149. The prosecution's questions do not elicit the jurors to commit to a particular verdict. In order for there to be per se error, the questions must be a direct request for a promise for a specific verdict. *Stringer*, 500 So. 2d at 938. Since we do not have such a request in the case at bar, our review is based upon the familiar abuse of discretion standard, and we find nothing in the record to indicate any such abuse. *Edwards*, 737 So. 2d at 308.

## XXIII. THE TRIAL COURT ERRED BY LIMITING THE VENIRE IN LAUDERDALE COUNTY.

¶150. Simmons next contends that the trial court erred by limiting the venire to: (1) qualified electors of Lauderdale County or resident freeholders for more than one year; (2) persons over the age of 21, and (3) persons who could read and write. Simmons argues that his rights under the Fifth and Fourteenth Amendments were violated as well as those under Article 3, Sections 14 and 26 of the Mississippi Constitution by so limiting the venire. Simmons's contention is that properly qualified citizens were denied their right to participate actively in government, which cannot be allowed. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 1369, 113 L. Ed 2d 411 (1991). Simmons extends the argument, originally concerning racial discrimination, to cover property ownership, age, and literacy citing cases not directly dealing with the right to be on a jury. *Quinn v. Millsap*, 491 U.S. 95, 109 S.Ct. 2324, 105 L. Ed. 2d 74 (1989); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). In addition, Simmons asserts that his right to a fair and impartial jury drawn from a cross section of the community was denied him by the venire limitations. However, Mississippi case law holds the contrary; in fact, restrictions such as these have

specifically been upheld by this Court. *Chase v. State*, 645 So. 2d 829, 844-45 (Miss. 1994);*Turner v. State,*573 So. 2d 657, 666 (Miss. 1990); *Irving v. State*, 498 So. 2d 305, 319 (Miss. 1986); *Leatherwood v. State*, 435 So. 2d 645, 654 (Miss. 1983); *Edwards*, 737 So. 2d at 319; *Wilson v. State*, 574 So. 2d 1324, 1331 (Miss. 1990).

¶151. Simmons's argument is further weakened by the fact that although the trial judge referred to them, no members of the venire were excluded based upon the three criteria. Therefore, the venire was not "limited" by the trial judge.

¶152. In addition, Simmons again failed to raise a contemporaneous objection to the use of the aforementioned criteria and is thus procedurally barred from asserting the claim on appeal. *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996).

## XXIV. THE TRIAL COURT ERRED BY ALLOWING THE SELECTED JURORS TO RETURN HOME AND PACK CLOTHING FOR THE WEEK BEFORE BEING SEQUESTERED.

¶153. Simmons contends that the trial court erred in allowing the jurors to go home and pack clothes for the week of trial without being sequestered. The defense further alleges that this act was in violation of procedural rules which state, "in any case where the state seeks to impose the death penalty, the jury shall be sequestered during the entire trial." Miss. U.R.C.C.C. 10.02. The principle of this rule is to insure a fair and impartial jury that will return a verdict beyond reproach.

¶154. The State first points out that Simmons did not object at the time of the decision which normally acts as a procedural bar. However, Simmons counters that requiring sequestration of a jury cannot be waived. *Wilson v. State*, 248 So. 2d 802, 805 (Miss. 1971).

¶155. With or without the procedural bar, Simmons argument fails under the recent case of *Watts v. State*, 733 So. 2d 214, 242-44 (Miss. 1999). Just as in the case at hand, the jury in *Watts* was allowed to go home to pack, but were admonished with special instructions. *Watts*, 733 So. 2d at 242. Although this Court stated that a better procedure would have involved the potential jurors bringing clothing with them before final selection, allowing the jurors to quickly go home "does not warrant reversal of the entire case." *Id.* at 244. In fact, the preferred procedure was unavailable to Judge Jones in the present case because jury selection began and ended in a single day. This allegation of error lacks merit without proof that one or more of the jurors disobeyed the judge's instructions.

## XXV. THE DEFENDANT HAS BEEN DENIED HIS RIGHT TO A MEANINGFUL APPEAL.

¶156. Simmons alleges that there are substantial omissions in the record that deny him the right to a meaningful appeal. Defense counsel lists as missing the following items: transcriptions of the bench conferences, sentencing phase instructions, and guilt/innocence phase jury instructions. The assertion is that the absence of these items leads to an incomplete record which, in turn, means there cannot be a truly meaningful review on appeal.

¶157. Simmons did not follow the proper procedure for correcting omissions in the record as set out in the Mississippi Rules. M.R.A.P. 10(c). The *Watts* case indicates that the failure to do so acts as a procedural bar to raising the issue on appeal. *Watts v. State,* 717 So. 2d 314, 317 (Miss. 1998).

¶158. The argument that the absence of the bench conference transcripts hurts the defense's case on appeal is meritless. Defense counsel failed to object to the lack of transcriptions at the time; thus, he is procedurally barred from raising the issue on appeal. **Burns v. State**, 729 So. 2d 203, 212 (Miss. 1998) ("It is in poor grace for counsel to participate without objection in unrecorded bench conferences and complain for the first time on appeal.") (quoting **Thorson v. State**, 653 So. 2d 876, 895 (Miss. 1994)).

¶159. The absence of the jury instructions is a more difficult situation. A true copy of said instructions is missing; however, affidavits and copies of transcripts of the instructions being read are included within the record. Thus, it is difficult to ascertain exactly what effect the inclusion of copies would have achieved. The record is sufficient to analyze all of the issues and properly review the case. Thus, this issue is procedurally barred, and bar notwithstanding, lacks merit.

## XXVI. MISSISSIPPI'S CAPITAL PUNISHMENT SCHEME IS UNCONSTITUTIONAL AND THE IMPOSITION OF THE DEATH PENALTY IN THIS CASE IS DISPROPORTIONATE.

¶160. The crux of Simmons's disproportionality argument is that Milano, the "trigger man", received only a life sentence while Simmons has been sentenced to die. Simmons supports this claim by pointing out that the jury did not find that he killed or attempted to kill anyone and that non-triggermen rarely receive the death penalty, although he fails to cite similar cases. The State, however, points out that the jury did find that Simmons intended Wolfe's death and contemplated that lethal force would be employed. In **Doss v. State**, 709 So. 2d 369, 400 (Miss. 1996), this Court held that, where a jury finds that the defendant intended the killing and contemplated that lethal force would be used, the death penalty is not disproportionate for a non-triggerman. In addition, this Court on several other occasions has ruled the death penalty was not disproportionate for those whom did not do the actual killing:

> This Court has affirmed death sentences where the appellants were not the actual killers. In **Stringer v. State**, 454 So. 2d 468 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985), Stringer, while not the actual triggerman, "was the instigator, the planner, the master-mind, and the one who directed the entire occurrence. According to the testimony of the two participants, the attempted armed robbery and the killing would not have occurred had it not been for appellant." **Stringer**, 454 So. 2d at 479. In **Leatherwood v. State**, 435 So. 2d 645 (Miss. 1983), this Court affirmed Leatherwood's sentence of death although he did not do the actual killing. More recently in **Ballenger v. State**, 667 So. 2d 1242 (Miss. 1995), the jury's sentence of death was unanimously affirmed by this Court even though Ballenger was not even present when the actual robbery and beating that resulted in the victim's death took place. In affirming, the Court held, "like **Stringer** and **Leatherwood**, [Ballenger] instigated and planned the robbery of Ellis. Her actions secured others to kill." **Id.** at 1268.

**Smith v. State**, 724 So. 2d 280, 304 (Miss. 1998). Under this authority and those in the attached Appendix, Simmons's sentence is not disproportionate even though he was not the person who actually shot and killed Wolfe. There is ample evidence to show that he did have an active role in planning and participating in the robbery and murder.

¶161. Simmons next contends that Mississippi's capital punishment scheme is unconstitutional as applied to him. The defense contends that the capital punishment scheme does not allow the jury to consider the fact

that Simmons did not kill or attempt to kill Wolfe as a mitigating factor. However, case law states the contrary. *Evans v. State*, 725 So. 2d 613, 684 (Miss. 1997).

¶162. Defense counsel's next argument is that the capital punishment scheme is unconstitutional on its face. As support, Simmons points out that premeditated murders are treated with more deference than a simple felony murderer making the scheme a form of disproportionate punishment. Also, the defense says that allowing the underlying felony to also be considered as an aggravating circumstance violates the Eighth Amendment and Section 28 of the Mississippi Constitution. However, this Court has held exactly the opposite:

> We have previously rejected this argument. See *Ladner v. State,* 584 So. 2d 743, 762 (Miss.1991); *Minnick v. State,* 551 So. 2d 77, 96-7 (Miss.1988), rev'd on other grounds, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). *Ladner* and *Minnick* expressly rejected the stacking argument based on the United States Supreme Court ruling in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). The *Minnick* Court stated that *Lowenfield* "held that the fact that the sole aggravating circumstance found by the jury in its penalty decision was identical to an element of the underlying offense did not violate the Eighth Amendment." *Minnick,* 551 So. 2d at 97.

*Bell v. State,* 725 So. 2d 836, 859 (Miss. 1998). Accordingly, the lower court will not be held in error on this issue.

## XXVII. THE ERRORS TAKEN TOGETHER IN THIS CASE WARRANT REVERSAL.

¶163. Simmons's final assertion of error is that each of the above enumerated errors, when taken together, warrant reversal as cumulative error. Simmons cites *Hickson v. State,* as authority for this proposition when this Court held that reversal was warranted by their perception of a combined prejudicial impact of two actions taken by the State that substantially compromised Hickson's right to a fair trial. *Hickson v. State,* 472 So. 2d 379, 385 (Miss. 1985).

¶164. The State counters with a quote from *Doss v. State,* which reads "[w]here there is no reversible error in any part, .... there is no reversible error to the whole." *Doss v. State,* 709 So.2d 369, 401(Miss. 1997). Additionally, this Court has held that a murder conviction or a death sentence will not warrant reversal where the cumulative effect of alleged errors, if any, was procedurally barred. *Doss,* 709 So.2d at 401. Cumulatively, these errors do not warrant reversal.

## CONCLUSION

¶165. The trial court committed no reversible error in its rulings below. Therefore, we affirm the conviction of Gary Carl Simmons of capital murder, rape and kidnaping, and the accompanying sentences of death and two terms of life imprisonment.

¶166. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED.**

**COUNT II: CONVICTION OF KIDNAPING AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**COUNT III: CONVICTION OF RAPE AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PITTMAN, C.J., WALLER, COBB, EASLEY AND CARLSON, JJ., CONCUR. McRAE, P.J., CONCURS IN PART. DIAZ, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., AND GRAVES, J.**

**DIAZ, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶167. At the outset, I would like to make clear that I agree with the majority's decision to affirm Simmons's conviction and the trial court's findings at the guilt phase of the trial. However, I believe the trial court committed reversible error when it refused to allow the video tape into evidence at the sentencing hearing as a mitigating factor. Additionally, I believe that the trial court should have allowed Lori Simmons to fully testify at the sentencing hearing when questioned by the defense. Therefore, I respectfully dissent.

¶168. Under Issue XIV, the majority points out that several times during the trial and sentencing phase, Simmons tried to introduce a videotape into evidence. Simmons recorded the videotape in Mobile, Alabama, hours after the killing. The recording is approximately 35-40 minutes long and simply shows him speaking to the camera, essentially addressing his ex-wife, Lori, and his two children. Much of what Simmons says in the video covers his feelings for them and instructions on what to do with his property after he turns himself in to the authorities.

¶169. However, Simmons makes several statements like, "I didn't think until after it was done. I can't make it undone. I would have. Oh God, I would have." He also makes a comment similar to "I don't know how it happened and afterward, I would have given anything to take it back, even my life." He also said things like, "It got out of hand and it wasn't supposed to go like this." These statements are peppered throughout the tape while he is constantly speaking to his family about how much he loves them. He also accepts responsibility for his actions. Simmons never directly admits that he killed anyone, but the insinuation is there in much of what he says.

¶170. During the closing arguments of the trial, the prosecution stated that Simmons had not shown any remorse for his crimes other than being upset that Leaser escaped from the box. During the sentencing phase, the prosecution made further statements to the effect that Simmons did not have a conscience.

¶171. Simmons argues that it should have been allowed into evidence during the sentencing phase of the trial. Although inadmissible at trial, Simmons argues that it would have rebutted the statements made by the prosecution concerning his lack of remorse or conscience. In *McCleskey v. Kemp,* 481 U.S. 279, 306, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), the Court held that a defendant is entitled to have the jury in a capital sentencing phase consider any relevant circumstance that could cause it to decline to impose the death penalty.

¶172. The United States Supreme Court has held that prejudice can be acute during the sentencing phase, when the jury must "attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins v. Nevada*, 504 U.S. 127, 144, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992). Additionally, Mississippi allows evidence of mitigating circumstance of an unlimited nature. *Mackbee v.*

*State,* 575 So.d 16, 39 (Miss. 1990) (citing *Leatherwood v. State,* 435 So. 2d 645, 650 (Miss.1983)). *Accord, Skipper v. South Carolina,* 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1(1986) (holding that exclusion during sentencing hearing of testimony that defendant had made a good adjustment during his time in jail denied defendant the right to introduce relevant mitigating evidence); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (constitutional demand for individualized consideration means that a sentencer cannot exclude as a matter of law any relevant mitigating evidence).

¶173. The majority discusses, at length, that the videotape is inadmissible hearsay, and I agree completely, as it pertains to the guilt phase. However, every case cited by the majority, including the "strikingly similar" *Nicholson ex rel. Gollott v. State*, 672 So. 2d 744 (Miss. 1996), deals with the admissibility of evidence **at trial**, during the guilt phase. The error before us lies in the exclusion of the videotape during the sentencing phase of the trial. The sentencing phase carries with it entirely different standards and considerations. *See Skipper*, 476 U.S. 1at 4-8; *Eddings*, 455 U.S. at 110-12; *Mackbee*, 575 So. 2d at 39. Furthermore, none of the cited authority relied upon by the majority concerns a possible death sentence.

¶174. After reviewing the tape, some of the statements can be interpreted as remorseful and thus mitigating in the eyes of the jury. Certainly, they appear to rebut the prosecution's claim that he showed no remorse whatsoever. Accordingly, I would find that it was reversible error for the trial court to exclude this videotape as mitigating evidence during the sentencing phase of the trial and would, therefore, vacate Simmons' death sentence and remand the matter to the trial court for a new sentencing hearing.

¶175. Under Issue XVII, the majority finds that the trial court did not commit reversible error when it prevented Lori Simmons, Simmons's ex-wife, to testify fully.[(10)]

¶176. Criminal defendants are entitled to heightened protection such as the Eighth Amendment right to allow all mitigating evidence at the sentencing stage. The U.S. Supreme Court has reiterated that the Eighth Amendment imposes special limitations when the death penalty is imposed. *Payne v. Tennessee,* 501 U.S. 808, 856, 111 S.Ct. 2597, 2625-26, 115 L.Ed.2d 720 (1991). Among those limitations, the high Court noted that "[s]tates cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot challenge the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant," and that mitigating factors must be allowed in an effort to treat defendants as "uniquely individual human beings." *Payne,* 501 U.S. at 822-24, 111 S.Ct. at 2606-08 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 305-06, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987)). Lori was not allowed to fully testify as the above-quoted passages from the transcript clearly reveal. The trial judge erroneously cut off Lori's testimony on several avenues. The better course of action would have been to allow her to fully answer the questions posed by defense counsel at the sentencing hearing. Therefore, I would also reverse the trial court on this issue and remand this case for a new sentencing hearing.

McRAE, P.J., AND GRAVES, J., JOIN THIS OPINION.

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Snow v. State*, --- So.2d --- (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999).

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997). **DEATH CASES AFFIRMED BY THIS COURT**

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*****Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

## DEATH CASES AFFIRMED BY THIS COURT

**(continued)** *Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984). **DEATH CASES AFFIRMED BY THIS COURT**

**(continued)** *Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978). **DEATH CASES AFFIRMED BY THIS COURT**

**(continued)** *Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

**DEATH CASES REVERSED AS TO GUILT PHASE**

**AND SENTENCE PHASE**

*Randall v. State, --* So. 2d -- (Miss. 2001).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State,* 684 So. 2d 625 (Miss. 1996).

*Lanier v. State,* 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State,* 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State,* 635 So. 2d 894 (Miss. 1994).

*Butler v. State,* 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State,* 607 So. 2d 1171 (Miss. 1992).

*Abram v. State,* 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State,* 598 So. 2d 731 (Miss. 1992).

*Griffin v. State,* 557 So. 2d 542 (Miss. 1990).

*Bevill v. State,* 556 So. 2d 699 (Miss. 1990).

*West v. State,* 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State,* 548 So. 2d 389 (Miss. 1989).

*Mease v. State,* 539 So. 2d 1324 (Miss. 1989).

*Houston v. State,* 531 So. 2d 598 (Miss. 1988).

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (continued)

*West v. State,* 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. 1983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990). **DEATH CASES REVERSED AS TO**

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

**ON SENTENCING PHASE ONLY**

**(continued)**

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. Simmons told Taylor he needed the boat "to go fishing."

2. State's Jury Instruction S-11 reads as follows:

   The Court instructs the jury that one who willfully, unlawfully, and feloniously aids, abets, assists, or otherwise encourages the commission of a crime is just as guilty under the law as if he or she had committed the whole crime with his or her hand.

3. Miss. Code Ann. § 97-1-3 reads: "Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not."

4. Miss. Code Ann. § 97-3-73 reads as follows:

   Every person who shall feloniously take the property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.

5. Dr. Ron Acton's name appears in the record and briefs of both parties spelled any number of ways. The defense brief alone spelled it two different ways. We chose this spelling because it was used by all parties at one point or another and a footnote in Simmons's reply brief seems to confirm this way as correct.

6. Miss. Code Ann. § 99-19-101(5)(c) reads in pertinent part:

   (2) After hearing all the evidence, the jury shall deliberate on the following matters:

(a) Whether sufficient factors exist as enumerated in subsection (7) of this section;

(b) Whether sufficient aggravating circumstances exist as enumerated in subsection (5) of this section;

(c) Whether sufficient mitigating circumstances exist as enumerated in subsection (6) of this section, which outweigh the aggravating circumstances found to exist; and

(d) Based on these considerations, whether the defendant should be sentenced to life imprisonment, life imprisonment without eligibility for parole, or death.

(3) For the jury to impose a sentence of death, it must unanimously find in writing the following:

(a) That sufficient factors exist as enumerated in subsection (7) of this section;

(b) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and

(c) That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances.

In each case in which the jury imposes the death sentence, the determination of the jury shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) of this section and upon the records of the trial and the sentencing proceedings. If, after the trial of the penalty phase, the jury does not make the findings requiring the death sentence or life imprisonment without eligibility for parole, or is unable to reach a decision, the court shall impose a sentence of life imprisonment.

(4) The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Mississippi within sixty (60) days after certification by the sentencing court of entire record, unless the time is extended for an additional period by the Supreme Court for good cause shown. Such review by the Supreme Court shall have priority over all other cases and shall be heard in accordance with rules promulgated by the Supreme Court.

(5) Aggravating circumstances shall be limited to the following:

(a) The capital offense was committed by a person under sentence of imprisonment.

(b) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.

(c) The defendant knowingly created a great risk of death to many persons.

7. Miss. Code Ann § 99-19-105 reads in pertinent part:

(1) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Mississippi Supreme Court. The clerk of the trial court, within ten (10) days after receiving the transcript, shall transmit the entire record and transcript to the Mississippi Supreme Court together with a notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the

~~offense, and the punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the Mississippi Supreme Court, a copy of which shall be served upon counsel for the state and counsel for the defendant.~~

~~(2) The Mississippi Supreme Court shall consider the punishment as well as any errors enumerated by way of appeal.~~

~~(3) With regard to the sentence, the court shall determine:~~

~~(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;~~

~~(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;~~

~~(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and~~

~~(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.~~

~~8. The sentencing instructions were lost. The transcript of the trial judge reading the sentencing instructions is contained in a supplemental volume to the record. The argument and information in the briefs are based upon this transcription.~~

~~9. Miss. Code Ann § 99-17-3 states in full:~~

~~In capital cases the defendant and the state shall each be allowed twelve peremptory challenges. In cases not capital the accused and the state each shall be allowed six peremptory challenges; but all peremptory challenges by the state shall be made before the juror is presented to the prisoner. In all cases the accused shall have presented to him a full panel before being called upon to make his peremptory challenges.~~

~~10.~~

~~BY DEFENSE COUNSEL BARTON: Lori, do you know what might have caused the events leading up to what happened on August the 13, 1996?~~

~~BY ASSISTANT DISTRICT ATTORNEY SAUCIER: To that I'm going to have to object. That's just too much speculation. We have tried to be as reserved on objections as we possible can.~~

~~BY THE COURT: Objection sustained.~~

~~* * *~~

~~BY DEFENSE COUNSEL BARTON: When you heard that Gary had been charged with this crime, did you believe that this was the same Gary that you had been married to all those years?~~

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: That's been asked and answered, Your Honor, earlier on when he asked her virtually the same question.

BY THE COURT: Objection sustained.

* * *

BY DEFENSE COUNSEL BARTON: Does he [Simmons] love [his daughters] Heather and Felicia?

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: Objection, Your Honor. Calls for speculation.

BY THE COURT: Objection sustained.

* * *

BY DEFENSE COUNSEL BARTON: Lori, would you like to see that type of continuing relationship, as bad as it may be, exist between you, Felicia, Heather and Gary?

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: Objection, Your Honor. That's impact on family members. We object to it.

BY THE COURT: Objection sustained.

* * *

BY DEFENSE COUNSEL BARTON: But you still would like the father of your children-

BY ASSISTANT DISTRICT ATTORNEY SAUCIER: Objection, Your Honor. That's an impact question.

BY THE COURT: Objection sustained.